# HITCHCOCK *v.* SMITH.

---

UNITED STATES MAILS; SECOND-CLASS MAIL MATTER; NOTICE; DEPARTMENTAL HEARINGS; PERIODICAL PUBLICATIONS; INJUNCTIONS.

1. A notice by the Third Assistant Postmaster General to publishers that on a specified day and place they will be given a hearing to show cause why second-class mail privilege heretofore accorded the issue of one of their publications shall not be revoked and third-class rates charged, on the ground that they do not constitute a newspaper or other periodical publication, but are in fact books, is sufficiently ex-

plicit, especially where the publishers admit that the question raised is one of law.

2. Departmental hearings, such as hearings to show cause why third instead of second class rates shall not be charged for carrying certain publications in the mails, are necessarily much more informal than judicial hearings, and in determining whether a legal hearing has been accorded in a given case there is no fixed or arbitrary rule that can be followed.

3. Where publishers upon whom a rule was laid by the Third Assistant Postmaster General to show cause why a privilege accorded the issues of one of their publications to be carried at second-class rates should not be revoked and third-class rates charged, submitted a written answer by their representative, to whom an oral hearing would have been given if he had asked it, and the answer was considered by that official before he made an order revoking the privilege, it cannot be successfully contended that a legal hearing was not given and the publishers deprived of their rights without due process of law. (Citing *Garfield* v. *United States*, 32 App. D. C. 153.)

4. While the question whether the issues of a publication constitute a periodical publication within the meaning of the act of Congress of March 3, 1879 (20 Stat. at L. 358, chap. 180) classifying mail matter, is one of law rather than one of fact, and, as such, is subject to judicial review, a decision by the Postoffice Department of the question in a given case is nevertheless entitled to great weight, and, unless clearly erroneous, will not be disturbed. (Following *United States ex rel. Reinach* v. *Cortelyou*, 28 App. D. C. 570, 12 L.R.A.(N.S.) 166.)

5. A decree enjoining the Postmaster General from revoking an order admitting the issues of a periodical publication having a circulation of about 100,000 copies, to the mails at second-class rates, was *reversed*, where it appeared that the publication was issued weekly, each issue being about 8x11 inches in size, consisting of about thirty-two pages, and containing a complete novel dealing with the adventures of the same hero, and also a few pages devoted to matters relating to the circulation of the publication, and questions and answers relating to athletics. (Citing act of Congress of March 3, 1879, 20 Stat. at L. 358, chap. 180, classifying mail matter.)

6. Where a decree granting an injunction was reversed by this court, the injunction, by agreement of the parties, was continued in force by order of this court, pending an appeal to the Supreme Court of the United States, upon the unsuccessful party giving a bond to be approved by this court.

No. 2059. Submitted February 9, 1910. Decided March 1, 1910.

HEARING on an appeal by the defendant, the Postmaster General, from a decree of the Supreme Court of the District of Columbia enjoining him from revoking an order admitting a publication to transmission through the mails at second class rates of postage.			*Reversed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a decree of the supreme court of the District of Columbia enjoining the Postmaster General, Frank H. Hitchcock, from revoking an order entitling the "Tip Top Weekly," a publication of appellees, Ormond G. Smith, George C. Smith, and Cora A. Gould, Trading under the Firm Name of Street & Smith, to second-class rates of postage, and from refusing to receive the issues of said publication and to transmit the same through the mails of the United States as matter of said class.

The order admitting this publication to said second class was dated March 1st, 1897. On May 17th, 1907, the Third Assistant Postmaster General, hereinafter called the Third Assistant, under whose supervision the classification of mail matter is made, sent the following notice to appellees:

"You are hereby notified that, in accordance with the act of Congress approved March 3, 1901 (chap. 851, 31 Stat. at L. 1107, U. S. Comp. Stat. 1901, p. 2655), you will be granted a hearing at the office of the Third Assistant Postmaster General, Washington, District of Columbia, at 2 P. M., on Tuesday, June 11th, 1907, to show cause why the authorization of admission of the Tip Top Weekly to the second class of mail matter under the act of March 3, 1879, should not be revoked, and why the third-class rate of postage should not be charged for the transmission of that publication in the mails, upon the following ground:

"That the issues of the Tip Top Weekly do not constitute a newspaper or other periodical publication as required by secs. 7, 10, 12, and 14 of the act of Congress of March 3, 1879, (chap. 180, 20 Stat. at L. 358, 359, 1 U. S. Rev. Stat. Supp.

246, U. S. Comp. Stat. 1901, pp. 2646, 2647), governing 'mailable matter of the second class,' but are in fact books, which, under sec. 17 of said act, are third-class matter, and chargeable, when sent in the mails, at the rate fixed by law for that class of mail matter.

"Your answer, in writing, must be submitted on or before June 11th, 1907.

"Should you desire to avoid the expense and trouble incident to a trip to Washington, your written answer will be given the same full and painstaking consideration as though you appeared in person or by representative."

Thereafter, on June 10th, 1907, a representative and employee of appellee, Wm. H. Heines by name, appeared at the office of the Third Assistant and submitted a printed answer to the above citation, saying that he would call on the day following, which was the return day named therein. His reason for leaving this answer on the day before the return day was "to give him (the Third Assistant), an opportunity to read the paper to see if he had anything to ask the next day." On the next or return day Mr. Heines again appeared at the office of the Third Assistant and, that official being engaged, was referred to the superintendent of the classification division, a Mr. Bacon. Mr. Heines was told by the secretary of the Third Assistant why that official could not then see him. Mr. Bacon informed Mr. Heines that he had looked over his brief or answer, and that the case had been very fully covered therein. Mr. Bacon then asked Mr. Heines "whether or not he had anything further to say, to which he made reply that he had not, except that he desired to have the department consider, in connection with the cases, a little pamphlet which he handed me, which showed the high regard in which the clergy—I believe it was the clergy—held the publication. And that circumstance I made a memorandum of and filed it in the case." The pamphlet referred to was entitled, "A General Description of the Character and Influence of the Present Day Dime Novels."

Mr. Heines was asked whether he disclosed his business to Mr. Bacon, and replied, *"I told him I was down there to an-*

*swer any questions they might ask me."* After his interview
with Mr. Bacon, the witness returned to the office of the Third
Assistant and found him still engaged. He left his card with
the clerk, with the statement that he would await any telephone
message that might be sent to him at his hotel in this city.
Witness was asked in cross-examination whether, upon that oc-
casion, he sent word to the Third Assistant that he desired to
see him personally, and answered, "I told the clerk that, yes.
I said that I would like to meet the gentleman." The witness
was further asked whether he informed the Third Assistant that
he wanted to make an argument, and replied; "No. Told him
I was there in reply to the citation." The witness admitted that
he made no attempt, in his interview with Mr. Bacon, to say
anything which he did not have in his printed brief; that he
had no other papers to file; that Mr. Bacon may have said to
him "that the brief covered the case very well."

We here reproduce the following questions and answers from
the cross-examination of this witness:

Q. Was there anything in your mind that you desired to
say, other than what you had incorporated in your answer?

A. No, sir.

Q. Your complaint is that they did not ask you any ques-
tions, is it not?

A. Yes, sir.

Q. In other words, you felt that, because you were not asked
questions, you did not get a hearing?

A. Yes, sir.

Q. That is your view of it?

A. Yes, sir.

Q. You wrote the brief, did you not?

A. Yes, sir.

Q. And you knew all the reasons which appeared in the cita-
tion?

A. Yes, sir; but I thought they might have something fur-
ther to say,—some more reasons.

Q. Is that what you complain about now?

A. We wanted to hear what more they had to say about it.

Q. I understand that you, nevertheless, have said to them what you wish to say in response to the charges in the citation?
A. Yes, sir.

On July the 26th the Third Assistant sent the following communication to the postmaster at New York, who notified the appellees as required in that letter:

"Sir: In connection with the rule to show cause, you are informed that a hearing was given the publishers of the 'New Nick Carter Weekly,' 'Buffalo Bill Stories,' the 'Tip Top Weekly,' and 'Diamond Dick, Jr.,' at this office on June 11, 1907.

"The arguments of the counsel for the publishers were considered and submitted to the Assistant Attorney General for the Postoffice Department, who held that the publications in question were not 'periodical publications' within the meaning of the law, but 'books,' and therefore not entitled to transmission at the second-class rates of postage.

"In this opinion I concur, and accordingly decide that the issues of the 'New Nick Carter Weekly,' 'Buffalo Bill Stories,' the 'Tip Top Weekly,' and 'Diamond Dick, Jr.,' do not constitute newspapers or other periodical publications as required by secs. 7, 10, 12, and 14 of the act of Congress of March 3, 1879 (chap. 180, 20 Stat. at L. 358, 359, 1 U. S. Rev. Stat. Supp. 246, U. S. Comp. Stat. 1901, pp. 2646, 2647), governing 'mailable matter of the second class,' but are in fact books, which, under sec. 17 of said act, are third-class matter, and chargeable, when sent in the mails, at the rate fixed by law for that class of mail matter.

"Therefore, the authority granted for acceptance of the 'New Nick Carter Weekly,' 'Buffalo Bill Stories,' the 'Tip Top Weekly,' and 'Diamond Dick, Jr.,' for mailing at the second-class rates of postage, is hereby revoked, and you are directed to enter that fact upon the records of your postoffice.

"You will require postage at the third-class rate, 1 cent for each two ounces or fraction thereof,—to be prepaid by stamps affixed upon each separately addressed copy or package or unaddressed copies of the publication hereafter mailed at your office.

"A copy of the opinion of the Assistant Attorney General for the Postoffice Department referred to is herewith inclosed, to be handed to the publishers for their information."

No application for a rehearing was made, but on August 8th, 1907, appellees filed their bill, in which they aver: "That the question whether the said publication is a periodical publication within the meaning of the law, and therefore entitled to transmission as second-class matter, is a pure question of law, to be determined by a comparison of the said publication itself with the conditions set out in the said act of March 3d, 1879."

*Mr. Daniel W. Baker,* United States Attorney for the District of Columbia, *Mr. F. Sprigg Perry,* and *Mr. James J. Britt,* Special Counsel for the Postoffice Department, for the appellant.

*Mr. H. H. Glassie* and *Mr. J. J. Darlington* for the appellees.

Mr. Justice ROBB delivered the opinion of the Court:

The learned trial judge based his decision upon the ground that the order revoking the privilege of mailing appellees' publication at the second-class rate of postage "was issued without a hearing such as is provided for by law."

We will first consider the assignments of error directed to this phase of the case. The act of March 3d, 1901 (31 Stat. at L. 1099–1107, chap. 851, U. S. Comp. Stat. 1901, p. 2655), ordains that "when any publication has been accorded second-class mail privileges, the same shall not be suspended or annulled until a hearing shall have been granted to the parties interested." No question is here made that the Third Assistant did not have jurisdiction in the premises, the objection being as to the manner of the exercise of his jurisdiction.

It is first contended that the notice to show cause was not sufficiently explicit. This objection, we think, is without merit. The notice stated that on a day named appellees would be called upon to show cause why the second-class mail privilege should

not be revoked and third-class rates charged, "upon the follow-ing *ground:* That the issues of the Tip Top Weekly do not constitute a newspaper or other periodical publication as re-quired by secs. 7, 10, 12, and 14 of the act of Congress of March 3d, 1879 (chap. 180, 20 Stat. at L. 358, 359, 1 U. S. Rev. Stat. Supp. 246, U. S. Comp. Stat. 1901, pp. 2646, 2647), governing "mailable matter of the second class," but are in fact books," etc.    No objection was raised as to the sufficiency of this notice, and the answer submitted "covered the case very fully."   The reference in the opinion of the Assistant Attorney General for the Postoffice Department to other publications of appellees is entirely immaterial.    The Third Assistant testified that this opinion "was a collective one, covering a number of publications," and was simply advisory.    Moreover, appellees in their petition aver that the question whether their publica-tion is a periodical within the meaning of the law, and entitled to registration as second-class matter, "is a pure question of law, to be determined by a comparison of the said publication itself with the conditions set out in the said act of March 3d, 1879."    That is, in effect, what they were told in the notice to show cause.    While the citation might have stated in greater detail the reasons prompting it, still this was not legally neces-sary.    The question, as suggested by appellees, was a legal one, and they were charged with notice of the requisites of a period-ical, and wherein their publication, intrinsically considered, failed to respond to those requisites.    Was their publication a periodical or was it a book?    The Department could not change the law.    It could neither add to nor take from the requisites of a periodical. . It could simply apply the law which, theoretic-ally, was as well known to appellees as to it.    We rule, therefore, that the notice given appellees was sufficient to enable them in-telligently to defend the privilege theretofore extended.

The next question is whether appellees were accorded a hear-ing.    In determining this question it must be remembered that no fixed and arbitrary rule has been laid down, and that hear-ings of such a nature are necessarily much more informal than judicial hearings.    *Palmer* v. *McMahon,* 133 U. S. 660, 33

L. ed. 772, 10 Sup. Ct. Rep. 324. Due process of law, in a case like the present, is had when full opportunity is presented to introduce all the evidence and arguments which the party interested deems important, and to be confronted with witnesses against him, he having had notice of the question at issue. *Pittsburgh, C. C. & St. L. R. Co.* v. *Backus,* 154 U. S. 421, 38 L. ed. 1031, 14 Sup. Ct. Rep. 1114; *Londoner* v. *Denver,* 210 U. S. 373, 52 L. ed. 1103, 28 Sup. Ct. Rep. 708; In *Garfield* v. *United States,* 32 App. D. C. 153–158, the question under consideration related to disbarment proceedings in the Interior Department, and this court, through Mr. Chief Justice Shepard, said: "Due process of law in such cases requires specific charges, due notice of the same, an opportunity to make specific answers to them, an opportunity to cross-examine the witnesses in support of them, an opportunity to adduce testimony in contradiction of them, and an opportunity for argument upon the law and facts."

In this case a written answer was submitted. The representative of appellees did not ask to introduce witnesses. There was no denial of the privilege of being confronted with opposing witnesses, because none were produced by the Department. It was not necessary for the Department officials to discuss the case with the representative of appellees. They had read the comprehensive answer submitted, and, in the light of its contents, had no further questions to ask. No advantage can be taken of the failure of the Third Assistant personally to see appellees' representative, because the testimony shows that that official, before reaching a decision, considered the answer submitted, and it fails to show that appellees' representative desired or offered to make an argument. The testimony of Mr. Heines leads irresistibly to the conclusion, suggested in one of his answers, that his real object in appearing before the Department was to gain further information concerning the attitude of the Department toward the publication mentioned in the citation, and not to make an argument before anyone. It is, we think, clear that had he desired a hearing before the Third Assistant, full opportunity would have been given him.

Vol. XXXIV.—34.

We come now to a determination of the question whether the issues of this publication constitute a periodical within the meaning of the act of March 3, 1879 (20 Stat. at L. 355, 358, chap. 180), relating to the classification of mail matter. While this question is one of law rather than one of fact and, as such, subject to judicial review, the decision of the Postoffice Department is nevertheless entitled to great weight, and, unless clearly erroneous, ought not to be disturbed. *United States ex rel. Reinach* v. *Cortelyou,* 28 App. D. C. 570, 12 L.R.A.(N.S.) 166; *Bates & G. Co.* v. *Payne,* 194 U. S. 106, 48 L. ed. 894, 24 Sup. Ct. Rep. 595.

It is admitted that this publication complies with the outward conditions and characteristics prescribed by law for mailable matter of the second class, the sole contention being that "internally, in substance and in general contents, it does not have the characteristics of said class of mail matter, but is in fact a book, and as such is included in the third class of mail matter as designated by law." This publication, as its name indicates, is issued weekly and has a circulation of something more than 100,000 copies. Of this number 2,500 are sent to regular subscribers, and the balance to the American News Company, which acts as distributing agent to the various news dealers throughout the country. The publication is about 8 by 11 inches in size, and each issue contains about thirty-two pages, substantially given over to one complete story, the last few pages being devoted to an announcement of the names of those who have made efforts to increase the circulation of the publication, commendatory letters purporting to come from its readers, and a few questions and answers relating to athletics. It is the custom of appellees to reissue these stories in book form, two or three stories being taken for a book. While the stories are reprinted for that purpose, they are not changed in other respects. It is contended by appellees that these stories, while complete in themselves, deal with the same hero and, for the most part, are written by the same author and form a more or less connected narrative. The testimony, however, does not fully bear out this contention. While it is true that the same

hero appears throughout the stories, and that they are mostly written by the same author, it is equally true that each story is a complete piece of fiction, not connected with or in any manner dependent upon any other story. The following stories which appeared in the series will give some idea of the extent to which "the stories run naturally from one to another," as contended by appellees:

"Frank Merriwell in Arizona; or, The Mysteries of the Mine."

"Frank Merriwell's Friend; or, Muriel the Moonshiner."

"Frank Merriwell's Double; or, Fighting for Life."

"Frank Merriwell Meshed; or, The Last of the Danites."

"Frank Merriwell in Gorilla Land."

"Frank Merriwell's Magic; or, The Pearl of Tangier."

"Frank Merriwell in London; or, The Grip of Doom."

"Frank Merriwell's Venture; or, Driven from Armenia."

"Frank Merriwell in India."

"Frank Merriwell's Vow; or, After Big Game in Ceylon."

"Frank Merriwell in Japan; or, The Sign of the Avenger."

"Frank Merriwell's Game; or, Snaring the Sharper."

"Frank Merriwell's Drift; or, With the River Drivers."

"Frank Merriwell on The Road."

"Frank Merriwell's First Part; or, The Start as an Actor."

"Frank in Advance; or, The Adventures ahead of the Show."

"Frank Merriwell's Own Company; or, Barnstorming in the Middle West."

"Frank Merriwell's New Venture; or, The Finding of Elsie."

"Frank Merriwell's Advancement; or, The Engineer of the Mountain Express."

"Frank Merriwell Held Up; or, The Robbery of the Mountain Express."

"Frank Merriwell as a Ferret; or, The Tracking of the Train Wreckers."

"Frank Merriwell's Peril; or, The Smugglers of the Border."

The real question in this case is whether the external or the internal characteristics of a given publication shall control in

determining the classification of that publication for transmission through the mails, whether a novel is entitled to go through the mails as matter of the second class, because it has been preceded and will be followed by other novels by the same author and relating to the same hero or characters. It is, in effect, contended on behalf of appellees that such was the intent of Congress in defining mailable matter of the second class, but the decision of the Supreme Court of the United States in *Houghton* v. *Payne,* 194 U. S. 88, 48 L. ed. 888, 24 Sup. Ct. Rep. 590, in which said act of March 3, 1879, was carefully reviewed, we think negatives that contention. The court was there dealing with the publications of the "Riverside Literature Series," which consisted of small books, each book containing a single novel or story, or a collection of poems or stories by the same author, and most, if not all, being reprints of standard works. Each number, however, was complete in itself and entirely disconnected with every other number. The court in its opinion undertook to define in a general way a periodical, which, the court said, "as ordinarily understood, is a publication appearing at stated intervals, each number of which contains a variety of original articles by different authors, devoted either to general literature of some special branch of learning or to a special class of subjects. Ordinarily each number is incomplete in itself, and indicates a relation with prior or subsequent numbers of the same series. It implies a continuity of literary character, a connection between the different numbers of the series in the nature of the articles appearing in them, whether they be successive chapters of the same story or novel, or essays upon subjects pertaining to general literature." In defining a book the court said: "A book is readily distinguishable from a periodical, not only because it usually has a more substantial binding (although this is by no means essential), but in the fact that it ordinarily contains a story, essay, or poem, or a collection of such, by the same author, although even this is by no means universal, as books frequently contain articles by different authors." The opinion concluded as follows: "We regard publications of the Riverside Literature

Series as too clearly within the denomination of books, to justify us in approving a classification of them as periodicals, notwithstanding the length of time such classification obtained."

If the issues of appellees' publication were reduced in size so as to correspond in that respect with ordinary novels, would anyone contend that they were not books within the meaning of the law? Manifestly, if a series of stories of the length of each of these stories is a periodical simply because periodically issued and so denominated, a series of stories or novels containing three times as much matter may also pass as periodicals.

Said act of March 3d, 1879, fixed an almost nominal rate of postage on "periodical publications" embracing (sec. 10) "all newspapers and *other* periodical publications." While the act prescribes certain requisites of a periodical publication, it stops there, and thus permits the ordinary meaning of the term to govern. *Houghton* v. *Payne,* supra. Mail matter is divided into four classes,—the designation of the first, written matter, and of the fourth, merchandise, being free from ambiguity. The second and third overlap and give rise to some uncertainty. The third class includes miscellaneous printed matter, and embraces "books, transient newspapers, and periodicals, circulars, and other matter wholly in print (not included in sec. 12), proof sheets, corrected proof sheets, and manuscript copy accompanying the same." It is clearly apparent, we think, that Congress, in extending nominal rates of postage to periodical publications, was actuated by a desire to serve the public rather than the publishers. In other words, we think it is apparent that Congress was endeavoring to provide a speedy and inexpensive vehicle of communication among the people, and that, when periodical publications were referred to, it did not have in mind dime novels. Books and publications like the one here involved may well await a less expensive, if less speedy, means of conveyance. There is no need for haste, and no apparent reason why the mails should be burdened with them.

There is absolutely nothing current in the issues of the publication under consideration. The January numbers would be just as satisfactory to appellees' patrons if sent in December,

and, as above indicated, the one difference between these stories and ordinary novels 'is the size of the publication. We are not able to distinguish the issues of this publication from the ordinary and every-day understanding of the term "book," and think it apparent that they are not entitled to be transmitted in the mails at second-class rates. We are certainly not prepared to hold that the exercise of the judgment and discretion of the postal authorities should be disturbed.

The decree must be reversed, with costs, and the cause remanded for further proceedings.                    *Reversed.*

A motion by the appellees to modify and amend the decree and order of this Court, was granted March 11, 1910, Mr. Chief Justice SHEPARD delivering the opinion of the Court:

Upon motion of the attorneys for the appellees herein, a decree and order passed in the above entitled cause on the first day of March, A. D. 1910, is hereby amended and modified as follows: That portion of the decree and order directing the cause to be remanded to the lower Court for further proceedings is hereby stricken out, and in place thereof the said decree shall read, "that the bill of complaint in said cause be, and it is hereby, dismissed, and the injunction issued on June 11th, 1909, be, and the same is hereby, dissolved, provided, however, that upon the appellees herein furnishing bond in the sum of $20,000, to be approved by the Court, the said injunction is to continue in force pending the appeal to the Supreme Court of the United States."

This decree was submitted by agreement of counsel and is entered as prepared by them.

On application of the appellees an appeal to the Supreme Court of the United States was allowed March 22, 1910.