ANDREWS et al. v. ST. LOUIS JOINT STOCK LAND BANK OF ST. LOUIS, MO., et al.

No. 11426.

Circuit Court of Appeals, Eighth Circuit.

Nov. 10, 1939.

Petition for Rehearing and Motion for Modification Denied Dec. 16, 1939.

---

[4] Reynolds v. McMurray, 10 Cir., 60 F.2d 843.

464

WOODROUGH, Circuit Judge, dissenting.

———◆———

June C. Smith, of Centralia, Ill., and Peter P. Schaefer, of Champaign, Ill. (Brandom Hope, of St. Louis, Mo., and Frank B. Leonard, of Champaign, Ill., on the brief), for appellants.

Peyton R. Evans, of Washington, D. C., and George C. Willson, of St. Louis, Mo. (Jacob Chasnoff and Hugo Monnig, both of St. Louis, Mo., on the brief), for appellees.

Before GARDNER, SANBORN and WOODROUGH, Circuit Judges.

GARDNER, Circuit Judge.

Appellants, who were plaintiffs below, by this appeal challenge the correctness of a decree of the lower court which after trial dismissed their amended bill of complaint. Plaintiffs, who are owners of certain bonds issued by the Central Illinois Joint Stock Land Bank of Greenville, Illinois, brought this suit for themselves and on behalf of all others similarly situated. In their amended bill of complaint they in effect sought a segregation of the assets transferred by the Central Illinois Joint Stock Land Bank of Greenville, Illinois, hereafter referred to as Greenville Bank, to the St. Louis Joint Stock Land Bank of St. Louis, Missouri, hereafter referred to as the St. Louis Bank, for the benefit of the owners of bonds issued by the Greenville Bank.

The Greenville Bank, with the approval of the Farm Board, for the purpose of liquidation transferred all its assets to the St. Louis Bank, which by contract assumed

and agreed to pay all the liabilities of the transferring bank. The lower court expressed the view that it was the purpose of the Farm Loan Act that all assets deposited with the registrar by a joint stock land bank should become collective security for all bonds issued or assumed by the bank, and that such banks were without authority by contract or otherwise to avoid the effect of the act. This case, on previous submission, was affirmed in an opinion by Judge Thomas. On petition, all the judges constituting the court hearing the cause, voted to grant a rehearing and the case has been reargued and resubmitted.

On this appeal plaintiffs contend, among other things, that: (1) the contract was within the power of the contracting parties; (2) the contract by which the rights of the parties are to be determined is unambiguous.

■ The act requires that a bank acquiring the assets of a transferring bank in process of voluntary liquidation shall "acquire the assets and assume the liabilities." 12 U.S.C.A. § 823. The contract must not only be executed by the two interested banks but must be approved by the Farm Board. A reading of the act reveals nothing which directly or by inference prohibits the making of the contract here involved. Neither the words nor the purpose of the act prevents the liquidating bank and the acquiring bank, with the approval of the Farm Board, from entering into a contract providing for the creation of a trust out of the acquired assets for the security of the holders of bonds issued by the liquidating bank. We are therefore of the view that the contract is valid and that the determining question depends upon the construction of that contract.

Plaintiffs here contend, and so contended in the court below, that under the unambiguous provisions of the contract, the Greenville Bank's mortgages and securities were·preserved as a specific security for the bonds issued by that bank and that if these transferred assets are not adequate to pay the bonds then the St. Louis Bank is liable for any deficiency in payment because of the assumption clause in the contract.

The provisions of the contract here material are as follows:

"Agreed, that the said The Central Illinois Joint Stock Land Bank of Greenville, Illinois, in consideration of the sum of Nine Hundred Thousand Dollars ($900,-000.00) to it in hand paid, receipt of which is hereby acknowledged, and covenants and agreements hereinafter made by the parties hereto, hereby sells and assigns to the said St. Louis Joint Stock Land Bank of St. Louis, all of its furniture, fixtures, records, supplies, promissory notes, real estate mortgages, in the sum of Eight Million, Five Hundred Sixty-nine Thousand Three Hundred Fifty Dollars ($8,569,350.00) and real estate, including all abstracts of title, insurance policies and other papers and documents held in connection with and pertaining to said mortgages and business, all of which furniture and fixtures are described in detail in 'Schedule A' and notes in mortgages in 'Schedule B' and real estate in 'Schedule C', all of which are hereto attached and made a part hereof.

"The St. Louis Joint Stock Land Bank of St. Louis on its part agrees to and does hereby assume the payment of farm loan bonds of the said The Central Illinois Joint Stock Land Bank of Greenville, Illinois, now outstanding, in the sum of Eight Million Three Hundred Thousand Dollars ($8,300,000.00) and interest thereon accruing since the last interest paying period. Such bonds are listed by number in 'Schedule D' hereto attached and made a part hereof.

"The Central Illinois Joint Stock Land Bank of Greenville, Illinois has with the registrar of the Federal Land Bank District Number Six, farm mortgages of which mortgages in the amount of Eight Million Four Hundred Forty-nine Thousand Five Hundred Fifty Dollars ($8,449,550.00) are to be left on deposit as security for the bonds of the said The Central Illinois Joint Stock Land Bank of Greenville, Illinois, hereby assumed in like amount."

■ The rights and liabilities of the St. Louis Bank with reference to the Greenville assets must be determined by the provisions of the Farm Loan Act, this contract, and the general rules of law governing liquidations under such a contract.

■■ Prior to the execution of this contract, each of these banks was an independent institution organized, existing and operating under the Farm Loan Act (12 U.S.C.A. § 641 et seq.). The Greenville Bank desired to go into voluntary liquidation which it was authorized to do by Section 822 of the act (12 U.S.C.A.), but before it could go into voluntary liquidation it was necessary that provision be made

for payment of its liabilities, and such provision required the approval of the Farm Loan Board. Under this act, we are of the view that such a bank had the right to go into liquidation at any time, provided it made provision for the payment of its liabilities with the approval of the Farm Loan Board. That board was not restricted by the act from approving any plan or method which in its judgment insured the application of its assets to the payment of its liabilities. In fact, the provision in Section 823 which authorized one joint stock land bank to acquire the assets and assume the liabilities of another was not in the act as originally passed, but came in by amendment on March 4, 1925, although prior to that time the act authorized liquidation conditioned on provision being made with the approval of the Farm Board for the payment of its liabilities.

In the instant case, the first plan proposed was that the St. Louis Bank would take over the outstanding capital stock of the Greenville Bank, but this plan was rejected by the Board. Such a plan made no provision for the payment of the liabilities of the Greenville Bank. The Board advised the banks that it would not approve any plan of liquidation which did not make provision for the payment of the liabilities of the Greenville Bank. Then, with the approval of the stockholders of both banks, evidenced by the adoption of proper resolutions, the contract here in question was entered into with the approval of the Farm Loan Board. It appears that the form of contract was furnished or at least suggested by that Board. It made specific provision that the farm mortgages of the Greenville Bank then on deposit and pledged with the registrar for the payment of its outstanding bonds must be left on deposit and preserved for the specific purpose of the payment of those bonds in an amount equal to the amount of the outstanding bonds.

■ We must assume that all parties concerned in this transaction intended to comply with the provisions of the Farm Loan Act requiring that provision be made for the payment of the liabilities of the Greenville Bank. This purpose is manifest by the acts of the parties including the resolutions passed by the stockholders of each of the banks and by the contract made pursuant to these resolutions, all being in effect a part of one transaction. The contract clearly and specifically provides that the mortgages of the Greenville Bank "are to be left on deposit" with the registrar "as security for the bonds of the said Central Illinois Joint Stock Land Bank of Greenville, Illinois." These mortgages had already been deposited pursuant to the requirements of the act and were being held by the registrar in trust for the bondholders owning bonds issued by the Greenville Bank. Section 853 of the act (12 U.S.C. A.) provides that, "The land bank which is to issue said farm loan bonds shall transfer to said registrar, by assignment, in trust, all first mortgages and bonds which are to be held by said registrar as collateral security, said assignment providing for the right of redemption at any time by payment as provided in this chapter and reserving the right of substitution of other mortgages qualified under sections 771 and 811–824 of this title [chapter]. Said mortgages and bonds shall be deposited in such deposit vault or bank as the Farm Credit Administration shall approve, subject to the control of said registrar and in his name as trustee for the bank issuing the farm loan bonds and for the prospective holders of said farm bonds."

Manifestly, when the two banks entered into their contract, the mortgages were already, by force of the statute and the acts of the parties, subject to a valid pledge in trust for the security of the bonds issued by the Greenville Bank. The Greenville Bank, as has already been observed, was an independent institution, unrelated to any other similar institution. This is not seriously disputed, but defendants contend that when the transfer was made the mortgages became pledged pari passu for the payment of bonds issued by the St. Louis Bank.

■ It is argued that this contract is ambiguous and that resort may be had to extrinsic evidence, or at least to departmental and administrative construction. Unless ambiguity exists, the court would have no occasion to invoke rules of interpretation. As said by us in Pitcairn v. American Refrigerator Transit Co., 8 Cir., 101 F.2d 929, 936: "Of course, if this contract is clear, certain and definite, its terms must be accepted without reference to any rules of interpretation. Courts have no right to make a contract for the parties that is different from that actually entered into by them."

■ We must assume that the parties understood the import of their contract and

that they had the intention which its terms manifest. United States ex rel. International Contracting v. Lamont, 155 U.S. 303, 15 S.Ct. 97, 39 L.Ed. 160; Baltimore v. Baltimore & O. R. Co., 10 Wall., U.S., 543, 19 L.Ed. 1043; National Surety Co. v. McGreevy, 8 Cir., 64 F.2d 899. If there is ambiguity, we may, to be sure, consider the surrounding circumstances at the time the contract was made, but not for the purpose of adding a new or distinct undertaking, but rather for the purpose of placing before the court the situation occupied by the parties when the agreement was made. This court has said that in interpreting a written contract, it will resort to a practical construction placed thereon by the parties only where there is doubt as to the meaning of the terms used, or the writing is silent or incompetent. Millers' Mutual Fire Insurance Ass'n v. Warroad Potato Growers Ass'n, 8 Cir., 94 F.2d 741. Contracts are not rendered ambiguous by the mere fact that the parties may not agree upon the proper construction to be given them. National Pigments & Chemical Co. v. C. K. Williams & Co., 8 Cir., 94 F.2d 792.

█ The resolution adopted by the stockholders of the Greenville Bank reads: "Resolved: That the Central Illinois Joint Stock Land Bank of Greenville be placed in voluntary liquidation under the provisions of an Act of Congress approved May 29, 1930 [1920] entitled 'an act under Section 16 of the act of Congress approved July 9 [17] 1916, known as the Federal Farm Loan Act.'"

This resolution was passed in compliance with the requirements of Section 822 requiring that the bank could only be placed in liquidation by making provision for the payment of its liabilities. We can not attribute to the stockholders an intent to defeat the payment of the Greenville bonds by disposing of the farm mortgages pledged as security for such payment.

█ The resolution passed by the St. Louis Bank reads: "Resolved: That subject to the approval of the Federal Farm Loan Board * * * that the assets of Central Illinois Joint Stock and Land Bank of Greenville, Illinois, be acquired and that this bank assume the outstanding liabilities of said bank, said acquisition to be in conformity with the provisions of act of Congress approved July 19 [May 29] 1920, known as 'Federal Farm Loan Act' * * *."

This resolution expressed the intention of the St. Louis Bank to acquire the assets and assume the liabilities of the Greenville Bank in conformity with the provisions of the Farm Loan Act. Again, we can not attribute to the St. Louis Bank, or its officers, any intention not to carry out the provisions of the Farm Loan Act, or to commit any fraud upon the holders of the bonds of the Greenville Bank. In approving the contract between the banks, it is clear that the Farm Loan Board intended to require a plan by which the payment of the liabilities of the liquidating bank would be secured. As has already been observed, it had prescribed the form of contract and it had rejected a prior plan proposed. The contract as written clearly and without ambiguity expresses the intent and purpose of all the parties interested to retain these farm mortgages in the amount of $8,449,550.00 "on deposit as security for the bonds of said The Central Illinois Joint Stock Land Bank of Greenville, Illinois * * *." If that were not the purpose and intent of the parties, then this provision was quite superfluous and should not have been written into this contract. We can not disregard it, and whatever other ambiguities, if any, may be contained in the contract, this provision is clear and unambiguous.

█ ▪ It is argued that the practical interpretation of the contract by acts of the parties is contrary to this view, and attention is called to the fact that the St. Louis Bank treated all collateral as collective security for bonds which it had issued or assumed. But its acts are in themselves insufficient to give a construction to the contract. The other party must concur if acts of performance are to be considered as aids in interpreting an ambiguous contract. Their minds must meet upon such a construction as they must in acts of original execution. In other words, it must appear that the alleged acts of contemporaneous construction by way of performance were the acts of both parties, done with knowledge and in view of a purpose consistent with that to which they are later sought to be applied. Sternbergh v. Brock 225 Pa. 279, 74 A. 166, 24 L.R.A., N.S., 1078, 133 Am.St.Rep. 877; City of Duluth v. Duluth Street R. Co., 137 Minn. 286, 163 N.W. 659, 10 A.L.R. 904; Miller v. Robertson, 266 U.S. 243, 45 S.Ct. 73, 76, 69 L.Ed. 265. In the last cited case, in an opinion by Mr. Justice Butler, it is said: "The opinion of the manager of the seller as to its legal obligations under the

contract, as reflected by his statements in correspondence after the execution of the instrument, is not entitled to any weight in determining whether a valid contract was made."

The charter of the Greenville Bank was cancelled December 1, 1925. The bondholders have never, so far as appears, concurred in, nor had knowledge of any of the alleged acts of performance urged as the basis of a practical construction. The rule of construction of an ambiguous contract by acts of performance by the parties has no application. They are insufficient to come within the rule if the rule could be invoked. But this provision of the contract being clear and unambiguous, the conduct of the parties can not be invoked as evidence that it means something different than it says. Buder v. New York Trust Co., 2 Cir., 82 F.2d 168, 104 A.L.R. 1035; Miller's Mutual Fire Ins. Ass'n v. Warroad Potato Growers Ass'n, supra.

■ The doctrine of administrative construction is also urged. A consideration of the details of the facts relied upon would serve no useful purpose and would unduly extend this opinion. For the most part, the acts or rulings relied upon occurred after this contract was entered into. Up to the time of the transactions here involved, and for some two years thereafter, the Farm Loan Board had consistently required all mortgages pledged as security to be pledged as security for a certain, specific and definite issue of bonds designated by series. There was no change in the administrative construction of the act until 1927, some two years after the contract here under consideration was made. True, it appears that in two instances, one occurring February 2, 1925, and the other September 21, 1925, joint stock land banks, having purchased assets and assumed liabilities, mingled the purchased assets with their own, and it is argued that since examinations were conducted at periodical intervals and the Farm Loan Board did not object or restrain such practice, an administrative approval was obtained. The question as to whether the so-called administrative construction was of such notoriety that a statute or a usage of common acceptance might be understood as forming part of a contract, may be put aside because the administrative construction contended for is too indefinite, obscure and dubious to form the basis of rights or to deprive persons of property.

■ It may well be that there was no occasion for construction or interpretation. An abundance of assets, apparent on casual examination, might well have made all creditors so secure that the commingling was disregarded as without prejudice. At a meeting of the Farm Loan Board held on April 15, 1927, the minutes show a resolution which contained the following:

"Whereas, first mortgages and/or bonds and cash have heretofore been assigned by land banks to the various registrars as collateral security for farm loan bonds issued by said banks upon forms which provide that they are assigned as security for a certain issue of bonds designated by series, and

"Whereas, it appears to be desirable, in order to carry out the purpose and intent of the federal Farm Loan Act that said mortgages heretofore pledged with the registrars shall be assigned generally in order that they shall be held by such registrars as security for all bonds heretofore or hereafter issued by the assigning banks; Therefore, be it Resolved, etc."

This record indicates that prior to its date the bank's mortgages and collateral were carried as a specific pledge for specific issues of bonds. Certainly, then, prior to that time there was no administrative construction to the contrary. But even this resolution limits the pledge of collateral to that issued by the bank, precluding the idea that such collateral was to be considered security for obligations assumed. Administrative rulings issued or promulgated, if at all, long after the contract here involved was entered into can not be invoked to limit any rights acquired by the bondholders under this contract. In any event, there was no construction of such a contract as is here before us. None of the acts of administrative interpretation is concerned with any contract. An administrative construction that has been neither uniform nor of long standing has no binding effect. Alexander v. Cosden Pipe Line Co., 290 U.S. 484, 54 S.Ct. 292, 78 L.Ed. 452; Iselin v. United States, 270 U.S. 245, 46 S.Ct. 248, 250, 70 L.Ed. 566. In the last cited case, Mr. Justice Brandeis said of construction by executive agencies, that it was neither uniform, general, nor long-continued, and neither was the statute ambiguous, and departmental construction

could not be given the force and effect of law; that what was asked was not construction of a statute, but in effect an enlargement of it by the court, so that what was omitted might be included within its scope. But, he said, "To supply omissions transcends the judicial function."

We have said that if the statutory meaning is clear, there is no occasion for rules which aid in ascertaining the meaning of the statute, and that neither legislative nor executive construction was of any aid or of force. Walker v. United States, 8 Cir., 83 F.2d 103. See, also, United States v. Missouri Pac. R. Co., 278 U.S. 269, 49 S.Ct. 133, 73 L.Ed. 322; Houghton v. Payne, 194 U.S. 88, 24 S.Ct. 590, 48 L.Ed. 888; Louisville & N. R. Co. v. United States, 282 U.S. 740, 51 S.Ct. 297, 75 L.Ed. 672.

We think by this contract, which the parties lawfully entered into, it clearly appears that the parties intended that the Greenville Bank mortgages already pledged were to remain so pledged for the payment of the Greenville bonds.

In addition to preserving the specific lien on the Greenville Bank mortgages as security for its bonds, the contract obligated the St. Louis Bank to pay the bonds. This was a contract obligation, and it is argued by appellants that it had the effect of preferring this contract obligation to the St. Louis Bank bonds. Counsel ingeniously argue that but for this contract, all the mortgages would stand as collective security for the bonds issued or assumed, and hence, the mortgages deposited by the St. Louis Bank and controlled by the registrar were not specific security for the bonds issued by that bank. In support of this contention, reference is made to the stipulation made by counsel during the trial of this case in the lower court to the effect that the rule of collective security should govern in this case but for the contract. But stipulation of counsel as to the law is not only not binding upon the court, but it is the duty of the court to determine the law regardless of the stipulation of the parties. Thus, in Swift & Co. v. Hocking Valley R. Co., 243 U.S. 281, 37 S.Ct. 287, 289, 61 L.Ed. 722, it is said: "If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law. * * * 'No stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court in this regard.'"

When this contract was entered into, each bank had its outstanding bonds for which its pledged mortgages stood as specific security. By the contract, the St. Louis Bank assumed the liabilities of the Greenville Bank, including, of course, the liabilities represented by its bonds. At that time each bank was apparently solvent and a going concern. The St. Louis Bank had not only its equity in its pledged mortgages, but it had a capital stock of $800,000. It had surplus funds amounting to $100,000. It had undivided profits amounting to $94,828.41. It had unpledged mortgages of $204,700. It had unpledged Government bonds and securities amounting to $702,521.87. It had cash on hand and in banks amounting to $58,571.18. In addition to this, there was the double liability of its stockholders for the debts of the bank, and it took over from the Greenville Bank certain unpledged assets as follows: unpledged mortgages $180,400, cash on hand and in banks $184,556.90, real estate and sheriff's certificates $180,498.27, legal reserve $48,800, reserve for taxes $21,722.12, and undivided profits $23,788.76.

When the St. Louis Bank assumed the liabilities, it in effect agreed to pay them, but this is all it agreed to do. It did not agree to take away from its own bondholders the security pledged and turn it over to the bondholders of the Greenville Bank. As observed, the bank had very substantial unpledged assets, and we must assume that the parties dealt with each other on the basis of the net value of the assets of the St. Louis Bank. Not only does the contract contain no requirement that the St. Louis Bank pay the obligations of the Greenville Bank out of its pledged assets, but it would have no authority by contract to deprive its own bondholders of the benefit of their security.

On this phase of the case, we conclude that the St. Louis mortgages constitute a separate trust for the benefit of the bondholders of that bank, with no liability on the part of the bank, or the receiver, to pay the bondholders of the Greenville Bank out of such trust assets until the prior claims of its own bondholders shall have been satisfied.

Plaintiffs were entitled to such of the mortgages of the Greenville Bank as

went into the hands of the receiver upon insolvency, thereby augmenting the volume and value of the estate. They are entitled to have the mortgages still in the hands of the receiver, that can be identified as Greenville mortgages, liquidated, and the proceeds applied to their claims, and they are entitled to have applied to their claims the proceeds already received by the receiver from the liquidation of Greenville mortgages which came into his hands. Under the assumption clause of the contract, plaintiffs are entitled to have their claims allowed for the full amount, without any credit for the value of the Greenville Bank mortgages pledged as security for its bonds, until they are paid in full. In other words, they are entitled to participate in dividends derived from the unpledged assets on the basis of the face amount of their claims, and not on the basis of the amount thereof reduced by the value of their securities, though, of course, they should not collect from all sources more than the amount of their claims. United States Fidelity & Guaranty Co. v. Centropolis Bank, 8 Cir., 17 F.2d 913, 53 A.L.R. 295; Guilford Construction Co. v. Biggs, 4 Cir., 102 F.2d 46. This court, in United States Fidelity & Guaranty Co. v. Centropolis Bank, supra, said [17 F.2d 915, 53 A.L.R. 295]: "Where the creditor of an insolvent bank holds collateral security for the payment of its debt, it is entitled to the allowance of a claim for the full amount of its debt, and to the payment of dividends on the entire debt, pro rata with general creditors, until the dividends, plus the amount realized from the security, equals the full amount of the debt."

Other contentions urged on this appeal, in view of our conclusion as to the validity and construction of this contract, are immaterial, and we pretermit any consideration of them.

The decree appealed from is therefore reversed, and the cause remanded for further proceedings consistent herewith.

WOODROUGH, Circuit Judge (dissenting).

The District Court's findings in this case state the controlling established facts clearly and accurately and its conclusions of law appeal to me as sound. I think its dismissal of the bill for want of equity was proper and that the compelling reasons are fully disclosed in the findings and conclusions. The decision of this court fails in my judgment to give due weight to the circumstances under which the contract of November 5, 1925, was executed, or to the objects and purposes the parties intended to accomplish by the use of the contract form supplied them by the Farm Credit Administration. The contract has been treated in the decision of this court substantially as though it was an original contract of pledge or trust intended to define the terms and conditions of a pledge or transfer in trust of securities then being made. It was, on the contrary, a contract to formally evidence the sale of all the seller's assets and the assumption of the seller's debts by the vendee. I think the few words found in the contract relating to the seller's previously transferred mortgages were intended to be generally descriptive of the trusts whose terms had been, and were well understood to have been, fully defined by other writings and by the Act. I find no substantial evidence in the contract or out of it to justify the disruption implicit in the majority opinion of the consistently maintained equable and lawful administration of the pledged farm mortgages of the Joint Stock Land Banks.

The fundamental of the Act as to the investing public is that there shall be at all times a dollar of farmers' notes held by the Registrar to secure each dollar of bonds outstanding, and that each dollar of the notes in turn shall be secured by first mortgage on two dollars appraised value of farm lands. This has been faithfully observed by the administration. There is no allegation that any group of farm mortgages is any better or any worse than any other group, or that any injury is done the plaintiffs or others similarly situated by the collectivization of the farm mortgage security. The opinion heretofore written for the court by Judge Thomas, in which I concur, makes further discussion on my part superfluous.

I dissent.