John B. VREELAND, d/b/a
Blair-Vreeland, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent.

No. 75–2550.

United States Court of Appeals,
Fifth Circuit.

March 22, 1976.

Charles R. Porter, Jr., Paul G. Kratzig, Lee H. Lytton, III, Corpus Christi, Tex., for petitioner.

Drexel D. Journey, Gen. Counsel, M. Frazier King, Jr., John H. Burnes, Jr., Attys., F.P.C., John H. Burnes, Jr., Allan A. Tuttle, Sol., Washington, D. C., for the F.P.C.

L. F. Cadenhead, Lilyan G. Sibert, Houston, Tex., Melvin Richter, Terence J. Collins, Washington, D. C., for intervenor Tenn. Gas Pipeline Co.

Before THORNBERRY, COLEMAN and MORGAN, Circuit Judges.

COLEMAN, Circuit Judge.

John B. Vreeland, doing business as Blair-Vreeland, petitions for review of Federal Power Commission Opinion and Order No. 724, dated March 18, 1975. On the ground that the gas had been

sold to Tennessee, the Commission ordered Vreeland to discontinue *intrastate* natural gas sales from wells numbered 1 and 2, DCRC Section 204, Santa Anna Garcia Survey, A–1845, Duval County, Texas; directed that Vreeland must sell the gas from those wells to Tennessee Gas Pipeline Company for *interstate* transmission; and ordered Vreeland to prepare "either a restitution plan or a report concerning its ability to effect restitution to Tennessee".

On the face of its Order the Commission acknowledged:

"The initial and fundamental question before us is a difficult one of contract construction: Is the gas that Vreeland is now selling intrastate subject to an earlier dedication to Tennessee and the interstate market, *as a result of a series of contracts between Exxon and Tennessee?*" [Emphasis added].

Construing the contracts one way, the Administrative Law Judge held that the gas produced from these wells *had not* been sold to Tennessee. By other reasoning the Commission held exactly to the opposite, that there *had been* a sale to Tennessee.

This case was orally argued in New Orleans on December 12, 1975. It has had our rather constant scrutiny since that date. If the contracts are ambiguous the record is silent as to who drafted them. Although Tennessee was a party to the contracts and likewise a party to the FPC proceedings, it chose to offer no testimony from those who drafted the contracts or from those who executed them to clear up the ambiguities.

Although excellent counsel have developed a copious record advancing many *theories* as to what the contracting parties actually intended, which within themselves have given birth to many ambiguities, our prolonged analysis leads us to the firmly held conviction that, read in a common sense fashion, there is nothing really ambiguous about the contracts and that the Administrative Law

Judge correctly fathomed their meaning. Consequently, we reverse the Commission Opinion and Order.

I

*The Genesis of the Controversy*

In July, 1972, John Vreeland, a petroleum geologist and sole proprietor of Blair-Vreeland, contacted Exxon agents in Corpus Christi, Texas. Vreeland wanted to lease wildcat acreage in Sections 204 and 205, DCRC, Duval County, Texas. He thought the field was called the Petrox Field and his request was termed accordingly but the correct description of the land actually involved was never misunderstood by any of the negotiators or contracting parties. The deep areas of the so-called Petrox Field were undeveloped. Only one deep well had ever been drilled in Section 204, and that lone attempt had been a failure. Petitioner's intention was to drill to the undeveloped depths, all the way to the Wilcox Sand.

After inquiring of the Houston Exxon offices, the Corpus Christi Exxon employees informed petitioner that the land was not dedicated. They indicated that Exxon was willing to do business with Vreeland, and correspondence was begun between petitioner and Exxon.

On July 12, 1972, Vreeland wrote Exxon to request a "farm out" of a portion of Exxon's leasehold in Section 204, Santa Anna Garcia Survey, A–1845. Vreeland wrote Exxon again on August 30, 1972. In these letters Vreeland offered to drill a test well which, if productive, would earn him a mineral lease in the specified acreage. In return, Exxon was to retain a ⅛ royalty interest in all production plus the option to convert that interest to ¼.

In the meantime petitioner inquired again about interstate dedication, and he was reassured by Exxon that there were no outstanding dedications.

In September, 1972, Blair-Vreeland accepted a farm out from Exxon entitling

him to drill to the Wilcox Sand for natural gas. The agreement entitled Vreeland to a mineral lease covering 320 acres upon completion of a successful first well. Petitioner could receive an additional 160 acres by commencing a second well within ninety days of completing the first. The subject acreage was described as "Santa Ana (sic) Garcia (J. Poitevent) Survey 204, Abstract 1845 . . . covered by . . . Oil, Gas and Mineral Lease dated May 30, 1929, from Duval County Ranch Company, as Lessor". Additionally, Exxon disclaimed any warranty of title and declared "we do not assume any liability whatsoever insofar as any outstanding mineral rights . . . [or] Gas Sales Contracts . . . are concerned".

Petitioner's first well was completed in January, 1973. It was a success, producing gas and distillate from the Wilcox Sand at depths of 7,062 feet to 7,082 feet subsurface.

Pursuant to state law, Blair-Vreeland in March, 1973, filed a record of the drilling with the Texas Railroad Commission. A notice of this filing was carried in a trade periodical, thus informing Tennessee of the well's existence.

## II

### Conduct of Principals Following Discovery of Conflicting Claims

After reading of Blair-Vreeland Well No. 1 in "Petroleum Information", Tennessee wrote petitioner to inform him that Tennessee had a prior claim to petitioner's gas. Tennessee told petitioner of their outstanding gas purchase contracts with Exxon and of the FPC dedication of the gas. Tennessee viewed petitioner as Exxon's successor in interest, and, therefore, they offered to purchase the gas production at the contracted interstate rate.

Having twice been assured of priority by Exxon, Vreeland was disturbed by Tennessee's letter. He called Exxon's Corpus Christi office, and they contacted Houston for the third time. This time Houston reported that the gas was dedicated to Tennessee as part of the Piedre de Lumbre Field, not the Petrox Field.

Petitioner then searched the Duval County Oil and Gas Records, but the Exxon-Tennessee contracts were not recorded.

As required by the farm out agreement, Blair-Vreeland completed his second well in the meantime, and Exxon assigned their leasehold in 480 acres of land to Vreeland. The assignment was completed in two documents dated June 29, 1973, and July 23, 1973, respectively. Principally, the assignments contained provisions equivalent to the farm out provisions: they disclaimed any warranty of title; they provided for ⅛ royalty interests to Exxon; and they gave Exxon the option to convert the ⅛ royalty to a ¼ interest. Additionally, Exxon was given the option to purchase Vreeland's gas at whatever purchase price offered to Vreeland by a third party. The acreage was described as, *inter alia*, Exxon's interests in "Santa Ana (sic) Garcia (J. Poitevent) Survey 204, Abstract 1845" as leased to Exxon under the "Oil, Gas and Mineral Lease dated May 30, 1929, from Duval County Ranch Company, as Lessor, to Humble Oil and Refining Company, as Lessee . . . ."

On the advice of counsel, petitioner spurned Tennessee's purchase offer. After Exxon declined to exercise their purchase option, Vreeland contracted to sell to Lo-Vaca Gathering Company, an intrastate distributor. Pursuant to the Excess Reserves Contract, Tennessee had offered $.25 per million cubic feet (Mcf); the Lo-Vaca contract called for $.50 per Mcf. Petitioner's wildcat drilling costs were so great he could not have profited by accepting Tennessee's offer. In a letter dated May 18, 1973, Vreeland told Tennessee of the Lo-Vaca deal, and informed them he did not consider his gas production to be dedicated to any sales contracts.

Thereafter, Exxon filed with the Commission a notice of partial rate schedule cancellation. By filing the notice, Exxon acknowledged (ex parte) that the leases they had assigned to Blair-Vreeland were covered by the Exxon-Tennessee contracts of August 1, 1952, and September 1, 1971. Exxon's request was that the Commission cancel the rate schedule relative to the assigned acreage because Blair-Vreeland was the current party of interest, not Exxon.

After Exxon filed their cancellation notice, Tennessee petitioned the Commission for leave to intervene. By order of November 30, 1973, the Commission granted intervention and ordered Blair-Vreeland to show cause why it should not be required to apply under Section 7 of the Natural Gas Act (15 U.S.C., § 717f) for authority to sell its gas to Tennessee; or, alternatively, to apply to abandon interstate production from leases dedicated in the interstate market.

Succinctly stated, Tennessee's position is that it is entitled to all natural gas produced from the 7,000 foot Wilcox Sand underlying Exxon's lease interest in Section 204, Santa Anna Garcia Survey, A–1845, Duval County, Texas. They maintain that Vreeland has assumed Exxon's obligation to sell the gas to Tennessee for interstate distribution.

On December 18, 1973, Vreeland applied to the Commission to have Exxon and Lo-Vaca Gathering Company made parties. However, the Commission denied the application, saying the rights and liabilities of Exxon and Lo-Vaca could better be handled by a court of law. This might have been correct except for the fact that Exxon was a party to the contracts with Tennessee which caused the difficulty in the first place.

### III

*The 1952–1956–1971 Contracts as Described in the Federal Power Commission Order*

*Pertinent contract provisions*

The Vreeland wells are described as Nos. 1 and 2, DCRC (Duval County Ranch Co.), Sec. 204, Santa Anna Garcia Survey, A–1845, Duval County, Texas. Well No. 1 is at 7062 feet to 7082 feet, and Well No. 2 is at 7028 feet to 7058 feet.

The Exxon-Tennessee contracts are five in number, of which the last two are the most important. The effect of the contracts, and their critical provisions, are these:

(1) The *Contract of August 1, 1952* (Exhibit 14), sometimes referred to as the District 4 contract, by which Exxon dedicated to Tennessee all of the gas underlying certain leases in Texas Railroad District No. 4. The Vreeland wells are not in an area subject to the 1952 contract.

(2) The *Supplemental Agreement of August 1, 1952* (Exhibit 14) imposed a 500 Bcf ceiling on the reserves dedicated under the District 4 contract. It provided that after the ceiling was met, Exxon could designate the reservoirs or leases to be released from the contract.

(3) The *Amendment of July 24, 1956* (Exhibit 15), which added to the reserves subject to the District 4 contract. Under the label "Piedre Lumbre Field", the following gas reserves were made subject to the dedication:

Oil, Gas and Mineral Lease dated May 30, 1929 from Duval County Ranch Company as Lessor to Humble Oil & Refining Company as Lessee insofar as said lease covering lands in . . . . Section 204, Santa Anna Garza Survey, A–1845 . . . all in Duval County, Texas, said lease being of record in Book 7, Page 442 of the Oil and Gas Lease records of said county. (Humble Lease No. 25580)

But this dedication was limited to the "Deepest Known Production in Field", defined in the case of the Piedre Lumbre Field as

| Sand Interval | | Operator and Well No. |
|---|---|---|
| From | To | Magnolia DCRC Section 96, |
| 6966 | 7042 | Unit 1, Well 1 |

Magnolia was the predecessor of the Mobil Oil Corporation.

(4) The *Retained Reserves Contract of September 1, 1971* (Exhibit 16), by which Exxon and Tennessee agreed that, because the 500 Bcf ceiling had been met, only certain specified reserves would remain subject to the contract of dedication. Section 4, entitled "Commitment", provides that

(a) Subject to the terms and provisions hereof, Seller commits to the performance of this agreement all gas produced from and attributable to the interest of Seller in certain reservoirs underlying leases located in . . . Piedre de Lumbre Field, Duval County, Texas . . . all as described in Exhibit "A", attached hereto and made a part hereof, insofar as said leases relate to those reservoirs not specifically excluded from commitment hereto, as set out in said Exhibit "A".

In Exhibit A, the following appears at pages 3–4:

### PIEDRE DE LUMBRE FIELD

Oil, Gas and Mineral Lease dated May 30, 1929, from Duval County Ranch Company as Lessor to Humble Oil & Refining Company as Lessee insofar as said lease covering lands in: . . . Section 204, Santa Anna Garcia Survey, A–1845 . . . all in Duval County, Texas, said lease being of record in Book 7, Page 442 of the Oil and Gas Lease records of said county. (Humble Lease No. 25580)

. . . . . .

Said leases in the Piedre de Lumbre Field shall be included in this Gas Sales Contract insofar, and only insofar, as they cover Seller's gas rights in reservoirs discovered prior to the effective date of this amendatory agreement from the surface of the ground down to and including the producing interval located at a depth of 6,966 feet to 7,042 feet in the Mobil Oil Corporation D.C.R.C. Section 96, Unit 1, Well 1; not including, however, the *7,000' Wilcox Sand* which is represented at 6,910 feet to 7,200 feet on Electrical Log in Mobil Oil Corporation

#13 Duval County Ranch Section 95 well.

The parties agree that the first part of the above quoted language from Exhibit A is the same as the language that appears in the 1956 amendment. The parties also agree that the second part, setting out the exclusion, describes the location of the Vreeland wells.

(5) The *Excess Reserves Contract of September 1, 1971* (Exhibit 17), by which Exxon agreed to sell to Tennessee reserves as listed in Exhibits A and B thereof. The section 4 "Commitment" provides in pertinent part:

(a) Subject to the terms and provisions hereof Seller commits to the performance of this agreement all gas produced from and attributable to the interest of Seller in certain leases located in . . . Piedre de Lumbre Field, Duval County, Texas, as described in Exhibit "A", attached hereto and made a part hereof, insofar as said leases relate to the specific reservoirs and depths set out in said Exhibit "A", and all new or future reservoirs discovered after the effective date of this agreement which underly said leases down to the depth limitation specified on Exhibit "B" for each field.

The Exhibit A Description for the Piedre de Lumbre Field provides

42. Oil, Gas and Mineral Lease dated May 30, 1929, from Duval County Ranch Company, as Lessor, to Humble Oil & Refining Company, as Lessee, insofar as said lease covering lands in: . . . Section 204, Santa Anna Survey, A–1845 . . . all in Duval County, Texas, said lease being recorded in Book 7, Page 442 of the Oil and Gas Lease Records of said county. (Humble Lease No. 25580)

. . . . .

Said leases in the Piedre de Lumbre Field shall be included in the Gas Sales contract insofar, and only insofar, as they cover Seller's gas rights in the *7000' Wilcox Sand* which is represent-

ed at 6,910 feet to 7,200 feet on Electrical Log in Mobil Oil Corporation #13 Duval County Ranch Section 95 well.

Exhibit B limits the section 4 commitment of "all future and new reservoirs discovered after September 1, 1971 . . to the depth specified for each field below":

Piedre de Lumbre From the surface of the ground down to and including the producing interval located at a depth of 6966′ to 7042′ in the Mobil Oil Corporation D.C.R.C. Section 96, Unit 1, Well 1.

*Construction of the contracts*

The question, then, is whether, in light of the foregoing contracts, the gas from Vreeland's wells, both of which were drilled after September 1, 1971, is or is not dedicated to Tennessee.

## IV

*Undisputed and Uncontested Facts*

A good way to get at the truth is to start from undisputed and uncontested facts. In this case the following points stand uncontested or undisputed:

1. Vreeland's wells are in Section 204, Santa Anna Garcia Survey, A–1845, Duval County, Texas.

2. Vreeland's wells are in the Piedre Lumbre Field.

3. Well no. 1 produces from 7,062 to 7,082 feet; well no. 2 produces from 7,028 to 7,058 feet, depth calculated from appropriate points of reference.

4. Vreeland's wells, although from the Wilcox Sand, are also from new reservoirs completed after September 1, 1971.

5. The 1952 contracts did not include the Piedre de Lumbre Field.

6. The 1956 contract included only the "deepest known production" [6,966–7,042 feet] in Piedre de Lumbre.

## V

*The Contracts of September 1, 1971*

This drives the lion to the lair, which Exxon and Tennessee, by their own draftsmanship, left in their 1971 contracts, thus setting the stage for this litigation.

These transactions were completed the same day and, in fact, disposed of the same subject matter, that is, a description of the gas which Exxon sold and Tennessee brought. But the parties chose to embody the transaction in two documents.

The first document was entitled "Amendment to Gas Purchase and Sale Contract", which the Administrative Law Judge and the Federal Power Commission referred to as the "Retained Reserves Contract". Quite obviously, the purpose of this contract was simply to *amend prior contracts*; it was not a new and independent one. For analytical purposes we shall refer to this as Contract A, although this is something of a misnomer because, in truth, both "contracts" amounted to one transaction, for one general purpose, i. e., the purchase and sale of gas to be severed from many Exxon leasehold interests, including Piedre de Lumbre.

The second contract was a new Gas Purchase and Sales Agreement, which the Administrative Law Judge and the Commission referred to as "The Excess Reserve Contract". We shall refer to it as Contract B.

We shall now compare these documents in parallel columns.

| CONTRACT A | CONTRACT B |
|---|---|

### Stated Purpose

Parties desire to amend the District 4 Contract so as to release the excess reserves (above 500 Bcf) attributable to such contract. Also to designate the portions of land, leases, and reservoirs containing gas reserves which shall remain subject (to the 500 Bcf limitation) and to amend in other respects, including extending the contracts beyond August 1, 1972.

### Stated Purpose

Seller desires to sell and Buyer desires to purchase all reserves in excess of 500 Bcf contained in specific reservoirs underlying certain District 4 fields.

### Stated Intent

To designate the reservoirs, lands, leases that shall remain subject to said contract, as designated in Exhibit A.

### Commitment

17 fields, including Piedre de Lumbre, except where excluded from the commitment in Exhibit A.

### Commitment

All gas produced in the Piedre de Lumbre Field in Duval County, Texas, as described in Exhibit A hereof "insofar as said leases relate to specific reservoirs and depths set out in Exhibit A, and all new or future reservoirs discovered after the effective date of this agreement...down to the depth limitation for each field as specified on Exhibit B".

Exhibit <u>A</u>

Piedre de Lumbre, Section 204, Santa Anna Garcia Survey, A-1845. Includes only reservoirs discovered prior to the effective date of this agreement, down to the interval 6966-7042 feet, not including the 7000 foot Wilcox Sand, 6910-7200 feet.

Exhibit <u>A</u>

Reservoirs and depths described below:  Piedre de Lumbre, Section 204, Santa Anna Garcia Survey, A-1845, limited to 7000 foot Wilcox Sand, 6910-7200 feet, with appropriate reference point.

Exhibit <u>B</u>

"The reserves underlying all future and new reservoirs discovered after September 1, 1971, as committed under Section 4 of the Contract (the commitment clause, above) are limited to the depth specified for each field below."

Piedre de Lumbre

From the surface of the ground down to and including the production interval located at a depth of 6966 to 7042 feet (with appropriate reference point).

---

From the above columnar comparison of contracts A and B we see that by *Contract A* Exxon could not have intended to sell, and did not sell, any of the gas later discovered by Vreeland's wells.  The sale included only *previously discovered reservoirs* to the depth 6966–7042; all reservoirs in the Wilcox Sand (6910–7200) were also specifically excluded.

The interests of the parties to this litigation, then, are defined by the agreements contained in *Contract B.*

The Administrative Law Judge stated:

Tennessee's entire position is that the reservoirs from which Vreeland is producing are embraced within and covered by Exhibit A of [Contract B] and that the coverage [there] of the 7000' Wilcox Sand must be read as including *all* production therefrom, *regardless of whether from new or existing reservoirs.*

This correctly states the issue and Tennessee has to rise or fall on this one point.

No evidence was introduced that *Contract B* was hastily, or carelessly, or ineptly drawn.  There is no suggestion of fraud, mutual mistake, or other like defects.  If the contract was ambiguous, nobody attempted to clear up the ambi-

guities by any explanation or elucidation of terms, intent, or meaning.

If we were to find the contract ambiguous, it would be our duty to remand for further hearing to clear up the ambiguities. As will soon be seen, we see no difficulties which would justify such a course. An ambiguity in a contract cannot be created by the mere assertions of a party to it, *Elbow Lake Co-op. Grain Co. v. Commodity Credit Corp.,* 8 Cir. 1958, 251 F.2d 633. A contract is not rendered ambiguous by the mere fact that the parties may not agree upon the proper construction to be given it, *Andrews v. St. Louis Joint Stock Land Bank of St. Louis,* 8 Cir. 1939, 107 F.2d 462, *cert. denied, sub nom., Cantley v. Andrews,* 309 U.S. 667, 60 S.Ct. 592, 84 L.Ed. 1014. The intention of the contracting parties is to be gathered from a survey of the instrument as a whole, not from its separate provisions, *Shuford Development Co. v. Chysler Corp.,* 5 Cir. 1971, 449 F.2d 429; *Pickren v. United States,* 5 Cir. 1967, 378 F.2d 595; *Insurance Co. of North America v. Delafield,* 5 Cir. 1960, 278 F.2d 683.

We accordingly begin by looking to the *purpose* of *Contract B,* as stated in the terms accepted by both contracting parties, and about which there can be no ambiguity:

Seller desires to sell and Buyer wishes to purchase all reserves in excess of 500 Bcf contained in *specific reservoirs* underlying certain District 4 fields [Joint appendix, 482].

We next look to the entire contents of the committing clause [4(a)]:

[Part I]

. . . Seller commits to the performance of this agreement all gas produced from . . . certain leases . . . as described in Exhibit "A" . . . insofar as said leases relate to the *specific reservoirs and depths* set out in Exhibit "A",

[Part II]

*and all new or future reservoirs* discovered after the effective date of this agreement which underly said leases down to the depth limitation specified on Exhibit "B" for each field. [Emphasis supplied].

We finally look to the opening sentence of Exhibit B:

The reserves underlying all *future and new reservoirs* discovered after September 1, 1971, as committed under Section 4 of the contract, are limited to the depth specified for each field below. [Emphasis supplied].

It thus seems clear to us that the overriding purpose and intent of Contract B was that *"reservoirs"* should be the all-inclusive, descriptive word in defining what Exxon sold and what Tennessee bought.

The contracting parties, however, did not stop there. They divided the reservoirs into separate classes: those (1) discovered and (2) those to be discovered.

Exhibit A to the contract stated that "the reserves are from *reservoirs* and depths described below", the word "depths" obviously intending to qualify the description of the reservoirs.

The new or future discoveries, also described as *reservoirs,* were separately distinguished as Exhibit B.

There is no evidence that the Wilcox Sand mentioned in Exhibit A constitutes one huge reservoir and, of course, it does not. More especially, if Exhibit A intended to include everything in the Wilcox Sand (6910–7200) it is indeed strange that the Wilcox was not exempted from the limitations set forth in Exhibit B. The reference to the Wilcox Sand in Exhibit A contained no *stipulation,* which the reasonably careful, competent draftsman would have included had he wanted it there, that it referred to all reservoirs then known or thereafter discovered of whatever depth, in that particular sand. Not in peace, as it turned out, the Exhibit A reference to the Wilcox Sand was left to rest within the four corners of the contract, to be read in its entirety and not through a keyhole.

Vreeland's wells were not in existence on September 1, 1971. The reservoirs from which they were produced had not

been discovered. As new wells they are beneath the depth prescribed by the commitment clause.[1]

 The Administrative Law Judge held that to read the contract as Tennessee wanted it read would make no sense. We agree. *Contract B* did not sell Tennessee the gas produced from Vreeland's wells.

We agree, without further prolongation of this opinion, that this gas, therefore, had not been dedicated to interstate commerce by prior filings with the Federal Power Commission.

The Opinion and Order of the Federal Power Commission is reversed.

Reversed.

---

1. The top fourteen feet of the producing sand in Vreeland's No. 2 Well is within the description contained in Exhibit B of Contract B. However, as the FPC in its Opinion No. 724 states on page 7 of its opinion and concedes in Footnote 1, no such contention was made before the Administrative Trial Judge, and since no such contention was made to us, we need not concern ourselves with the problem.