## HOUGHTON *v.* PAYNE.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 372. Argued March 10, 1904.—Decided April 11, 1904.

Contemporaneous construction is a rule of interpretation but it is not an absolute one and does not preclude an inquiry by the courts as to the original correctness of such construction. A custom of a department of the Government, however long continued by successive officers, must yield to the positive language of the statute.

Periodical publications as defined in the Post Office bill of March 3, 1879, do not include books complete in themselves and which have no connection with each other, simply because they are serially issued at stated intervals more than four times a year, bound in paper, bear dates of issue and numbered consecutively; and the Postmaster General can ex-

clude them from second class mail notwithstanding they have been heretofore transmitted as such by his predecessors in office.

The terms "periodical" and "periodical publication," as used in the act of March 3, 1879, are used in their obvious and natural sense, and denote the well-recognized and generally understood class of publications commonly called by the name of "periodical."

The provisions of § 14, act of March 3, 1879, are not descriptive of the kind of publication which is to be admitted to the class of periodical publications provided for by §§ 7 and 10 of said act, but are express limitations added to the description in those sections.

The provisions of § 14 are not to be taken to determine what is a periodical publication, but to ascertain whether, being such a publication as is contemplated by § 10, it also answers the additional conditions there imposed.

The fact that publishers may have made contracts for the future delivery of their publications at prices founded on confidence in the continuance of the certificate of admission to the mails at second class rates, issued under a former administration of the Post Office Department, does not entitle them to an injunction restraining the present administration from ascertaining the true character of the publication and charging the legal rate accordingly.

THIS was a bill in equity originally filed in the Supreme Court of the District of Columbia by the firm of Houghton, Mifflin & Co., against the Postmaster General, praying that a certain publication, known as the Riverside Literature Series, be entered and transmitted through the mails as second class mail matter, and for an injunction to restrain the cancellation of a certain certificate of entry, previously issued, allowing such transmission.

The answer denied that the Riverside Literature Series constituted a periodical within the meaning and intent of the statute; that, although complying with the external characteristics and conditions of second class mail matter, nevertheless, internally and in substance, they have not the characteristics of second class matter, but have the peculiarities of books, and are in fact books.

The case was heard upon the pleadings and an exhibit of the series, and a decree rendered in accordance with the prayer of the bill. 31 Wash. L. R. 178. An appeal was taken to the Court of Appeals of the District of Columbia, which reversed the decree and dismissed the bill. 31 Wash. L. R. 390.

*Mr. William S. Hall* and *Mr. Holmes Conrad* for appellants, in this case and in No. 373:

As to discretion of Postmaster General, see *Payne* v. *Pub. Co.*, 20 App. D. C. 581; R. S. §§ 161, 406, 3909, 3932, 3936; H. R. bill 4910, to amend § 14 of the act of March 3, 1879, and remarks of Mr. Cannon thereon, Cong. Rec. Feb. 2, 1888, vol. 19, 911; April 24, 1894, amendment proposed to Post Office bill, Cong. Rec. vol. 26, part 5, 4050; January 7, 1897, H. R. bill 4566, the "Loud Bill" to amend postal laws, Sen. Rep. 54 Cong. 2d sess. No. 1517. Not until after the defeat of the Loud Bill was regulation § 276 amended.

The bill does not seek to control the judgment of the Postmaster General in any matter calling for the exercise of judgment. For statutes prior to 1879 regulating mail matter of this nature, see Statute of 1845, ch. 43, § 16; of 1852, § 2; of 1863, ch. 71, § 20; of 1872, ch. 335, reënacted Rev. Stat. § 3875 *et seq.* As to proper rule of construction, see *Platt* v. *Union Pacific*, 99 U. S. 58. The broad and beneficent purpose of Congress expressed in the act of March 3, 1879, is confirmed and accentuated by the act of July 16, 1894, 28 Stat. 104. As to what periodical publications were supposed to include in 1879, see 15 Op. Atty. Gen. 346. The construction contended for would not result in free admission of foreign novels in view of the Tariff Acts of 1890, ch. 1244, par. 657; 1894, ch. 349, par. 562. A long established construction of an executive department should not be disregarded where contracts have been made and liabilities incurred on the faith thereof.

Where the language of an act is so clear as not to be open to construction, its construction cannot be changed by long continued practice of the department; but if there is doubt as to the meaning of the act, then such a practice would be persuasive, if not controlling. *United States* v. *Graham*, 110 U. S. 219; *United States* v. *Hill*, 120 U. S. 169; *United States* v. *Finnell*, 185 U. S. 236, 244; *United States* v. *Alabama Railway Co.*, 142 U. S. 621; *Del Monte* v. *Last Chance*, 171 U. S. 55, 62.

The object of the Postmaster General can only be accomplished by an amendment of the statute. *Morrill* v. *Jones,* 106 U. S. 466. Courts will not intervene in cases that are pending in a Department. *Johnson* v. *Towsley,* 13 Wall. 86; *Brown* v. *Hitchcock,* 173 U. S. 473, 477; *Carrick* v. *Lamar,* 116 U. S. 423, 426; *Moore* v. *Robins,* 96 U. S. 530, 535; *Sandford* v. *Sandford,* 139 U. S. 642, 647. A legal error by the Postmaster General does not bind the courts. *School of Healing* v. *McAnnulty,* 187 U. S. 94, 109.

If it is held that these publications do come within the statute, the question is wholly within the control of the Postmaster General and is not subject to review by the courts. *Noble* v. *Union River L. R. R.,* 147 U. S. 165, 170; *United States* v. *Wright,* 11 Wall. 648.

*Mr. Tracy L. Jeffords,* with whom *Mr. Charles F. Moody* and *Mr. E. Van Buren Getty* were on the brief, for appellants in No. 481:

Congress has sole and exclusive power over the entire postal system of the United States. *Jackson* v. *United States,* 96 U. S. 727; *Morrill* v. *Jones,* 106 U. S. 466; *Campbell* v. *United States,* 107 U. S. 407.

These publications are second class mail matter and are entitled to be so classified and carried.

Former Postmaster Generals have so construed the statute of 1879 and such construction was proper, and the practice should not be disturbed. *Brown* v. *United States,* 113 U. S. 568; *United States* v. *Richardson,* 28 Fed. Rep. 61; *Packard* v. *Richardson,* 17 Massachusetts, 144; *The Queen* v. *Cutbush,* 2 Q. B. 379; *United States* v. *Philbrick,* 128 U. S. 52; *Noble* v. *Union River Logging R. Co.,* 147 U. S. 165; *The Laura,* 114 U. S. 411; *United States* v. *Hill,* 120 U. S. 169.

The cancellation of appellants' second class mail certificates deprives them of their property without due process of law. The right to use the mail is a property right. *Hoover* v. *McChesney,* 81 Fed. Rep. 472.

*Mr. John G. Johnson* and *M∴ Henry H. Glassie*, special assistants to the Attorney General, for appellee in this case and in Nos. 373 and 481:

In this case the court is not dealing with a burden upon the citizen but with a governmental grant of privilege and benefit, and doubt, if any, must be resolved in favor of the Government. *Swan & Finch Co.* v. *United States,* 190 U. S. 143, 146; *Hannibal &c. R. R. Co.* v. *Packet Co.,* 125 U. S. 260, 271.

The determination by the Postmaster General that these publications are not periodicals is the determination of a matter of fact committed to his jurisdiction; such finding is therefore final and conclusive, this notwithstanding *School of Healing* v. *McAnnulty,* 187 U. S. 94; *Payne* v. *Nat. Ry. Pub. Co.,* 20 App. D. C. 581.

As to how far mandamus or injunction can be exercised over or against an executive officer, see *Marbury* v. *Madison,* 1 Cranch, 137; *Kendall* v. *Stokes,* 3 How. 87; *New Orleans* v. *Paine,* 147 U. S. 261, 264; *Noble* v. *Union River L. Co.,* 147 U. S. 165, showing that they will not issue for error; *Riverside Oil Co.* v. *Hitchcock,* 190 U. S. 316, 325; *Gaines* v. *Thompson,* 7 Wall. 347; *Dunlap* v. *Black,* 128 U. S. 40, 45; *Litchfield* v. *Richards,* 9 Wall. 575, 577; *In re Isaac L. Rice,* 155 U. S. 396, 403.

Whatever the power of the court may be as to whether an executive officer is acting within his jurisdiction, his ascertainment of questions of fact is conclusive. *Gardner* v. *Bonestell,* 180 U. S. 362, 370; *Japanese Emigrant Case,* 189 U. S. 86, 98; *Johnson* v. *Drew,* 171 U. S. 93, 99; *Burfenning* v. *Railway Co.,* 163 U. S. 321; *Smelting Co.* v. *Kent,* 104 U. S. 636, 645.

It is a familiar principle that distinguishes refusing to set aside a finding because one does not think it was reasonable and setting a finding aside because no reasonable person could have found it. *Bridge* v. *Directors &c.,* L. R. 7 Eng. & Ir. App. 221, 233. See also *Railway Co.* v. *Wright,* L. R. 11 App.

Cas. 152; *B. & O. R. R. Co.* v. *Griffith,* 159 U. S. 603; *Morande* v. *Texas & Pacific,* 184 U. S. 173, 186.

There is no question here of denying any one the use of the mails; it is only a question of rate charged for such use.

The Postmaster General has the power and it is his duty to charge the legal rate on all matter transmitted through the mail and neither he nor the court is bound by the determination made by former Postmasters General in this respect. *United States* v. *McDonald,* 7 Pet. 114; *Wisconsin Central* v. *United States,* 164 U. S. 190; *United States* v. *Harmon,* 147 U. S. 268. And see *Fairbank* v. *United States,* 184 U. S. 284, 308.

There was no want of power, and Congress has never sanctioned the suggestion of any such want.

Debates in Congress are not appropriate sources of information from which to discover the meaning of the language of a statute. *United States* v. *Union Pacific,* 91 U. S. 72, 79; *Aldridge* v. *Williams,* 3 How. 9, 24; *Mitchell* v. *Grant &c. Co.,* 2 Story, 648, 653; *Queen* v. *Hertford College,* 3 Q. B. D. 693, 707; *United States* v. *Freight Association,* 166 U. S. 293, 318.

The courts cannot undo judicially what the Postmaster General has already done administratively. *United States* v. *Wright,* 11 Wall. 648.

The fact that the matter was admitted at one time as second class matter does not estop the United States. *The Floyd Acceptances,* 7 Wall. 666; *Wisconsin Central* v. *United States,* 164 U. S. 190, 210; *United States* v. *Kirkpatrick,* 9 Wheat. 727, 735; *Whiteside* v. *United States,* 93 U. S. 247, 257; *Hawkins* v. *United States,* 96 U. S. 689.

Mr. Justice Brown, after making the foregoing statement, delivered the opinion of the court.

This case depends upon the construction of the following sections of the Post Office appropriation bill of March 3, 1879, 20 Stat. 355, 358:

"Sec. 7. That mailable matter shall be divided into four classes:

" First. Written matter;

" Second. Periodical publications;

" Third. Miscellaneous printed matter;

" Fourth. Merchandise."

Matter of the second class is thus described:

"Sec. 10. That mailable matter of the second class shall embrace all newspapers and other periodical publications which are issued at stated intervals, and as frequently as four times a year, and are within the conditions named in section twelve and fourteen.

"Sec. 11. Publications of the second class except as provided in section twenty-five, when sent by the publisher thereof, and from the office of publication, including sample copies, or when sent from a news agency to actual subscribers thereto, or to other news agents, shall be entitled to transmission through the mails at two cents a pound or fraction thereof, such postage to be prepaid, as now provided by law.

"Sec. 12. That matter of the second class may be examined at the office of mailing, and if found to contain matter which is subject to a higher rate of postage, such matter shall be charged with postage at the rate to which the inclosed matter is subject: *Provided,* That nothing herein contained shall be so construed as to prohibit the insertion in periodicals of advertisements attached permanently to the same."

"Sec. 14. That the conditions upon which a publication shall be admitted to the second class are as follows:

"First. It must regularly be issued at stated intervals, as frequently as four times a year, and bear a date of issue, and be numbered consecutively.

"Second. It must be issued from a known office of publication.

"Third. It must be formed of printed paper sheets, without board, cloth, leather or other substantial binding, such as distinguish printed books for preservation from periodical publications.

"Fourth. It must be originated and published for the dissemination of information of a public character, or devoted to

literature, the sciences, arts or some special industry, and having a legitimate list of subscribers: *Provided, however,* That nothing herein contained shall be so construed as to admit to the second class rate regular publications, designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates."

And by the act of March 3, 1885, 23 Stat. 385, it was provided that second class matter (saving that excepted in section 25) shall, on and after June 1, 1885, be entitled to transmission through the mails at one cent a pound or fraction thereof.

Section 17 declares that mail matter of the third class shall embrace books, transient newspapers and periodicals, circulars, etc., and postage shall be paid at the rate of one cent for each two ounces or fractional part thereof.

Are the publications of the Riverside Literature Series periodicals, and therefore, belonging to the second class of mail matter, and entitled to transmission at the rate of one cent a pound; or books, as designated in the third class, and subject to postage at the rate of one cent for each two ounces?

The publications are small books, 4½ by 7 inches, in paper covers, and are issued from the office of publication either monthly or quarterly, and numbered consecutively. Each number contains a single novel or story, or a collection of short stories or poems by the same author, and most, if not all of them, are reprints of standard works by Thackeray, Whittier, Lowell, Emerson, Irving, or other well known writers, and from a literary point of view are of a high class. Each number is complete in itself and entirely disconnected with every other number. Upon the front page of the cover appears, at the top, the words "Issued Monthly," followed by the number of the serial and the date of issue. Below, the words "Riverside Literature Series" are prominently displayed, and in the center of the page appears the name of the book. Each number complies with the conditions of section 14, upon which the publication may be admitted to the second class, namely,

it is regularly issued at stated intervals, at least quarterly, and bears a date of issue and is consecutively. numbered. It is issued from a known office of publication; is formed of printed paper sheets, without board, cloth or leather, or other¥substantial binding, and is published for the dissemination of information of a public character; or devoted to literature, etc. The bill also avers that the series has a legitimate list of subscribers, but does not aver that they were reading subscribers in the ordinary sense of the term. This distinction, however, is not pressed by the Government. If the fact be that this series becomes a periodical by a compliance with the conditions of section 14, under which it is entitled to be transmitted as second class mail matter, we shall be compelled to say that the decree of the court below was wrong.

But while section 14 lays down certain conditions requisite to the admission of a publication as to mail matter of the second class, it does not define a periodical, or declare that upon compliance with these conditions the publication shall be deemed such. In other words, it defines certain requisites of a periodical, but does not declare that they shall be the only requisites. Under section 10 the publication must be a "periodical publication," which means, we think, that it shall not only have the feature of periodicity, but that it shall be a periodical in the ordinary meaning of the term. A periodical is defined by Webster as "a magazine or other publication which appears at stated or regular intervals," and by the Century Dictionary as "a publication issued at regular intervals in successive numbers or parts, each of which (properly) contains matter on a variety of topics and no one of which is contemplated as forming a book of itself." By section 10 newspapers are included within the class of periodical publications, although they are not so regarded in common speech. By far the largest class of periodicals are magazines, which are defined by Webster as "pamphlets published periodically, containing miscellaneous papers or compositions." A few other nondescript publications, such as railway guides, ap-

pearing at stated intervals, have been treated as periodicals and entitled to the privileges of second class mail matter. *Payne* v. *Railway Pub. Co.*, 20 D. C. App. 581. Publications other than newspapers and periodicals are treated as miscellaneous printed matter falling within the third class.

While it may be difficult to draw an exact line of demarkation between periodicals and books, within which latter class the Riverside Literature Series falls, if not a periodical, it is usually, though not always, easy to determine within which category it falls, if the character of a particular publication be put in issue.

A periodical, as ordinarily understood, is a publication appearing at stated intervals, each number of which contains a variety of original articles by different authors, devoted either to general literature of some special branch of learning or to a special class of subjects. Ordinarily each number is incomplete in itself, and indicates a relation with prior or subsequent numbers of the same series. It implies a continuity of literary character, a connection between the different numbers of the series in the nature of the articles appearing in them, whether they be successive chapters of the same story or novel or essays upon subjects pertaining to general literature. If, for instance, one number were devoted to law, another to medicine, another to religion, another to music, another to painting, etc., the publication could not be considered as a periodical, as there is no connection between the subjects and no literary continuity. It could scarcely be supposed that ordinary readers would subscribe to a publication devoted to such extensive range of subjects.

A book is readily distinguishable from a periodical, not only because it usually has a more substantial binding, (although this is by no means essential,) but in the fact that it ordinarily contains a story, essay or poem, or a collection of such, by the same author, although even this is by no means universal, as books frequently contain articles by different authors. Books are not often issued periodically; and, if so, their periodicity

is not an element of their character. The reason why books
of the Riverside Literature Series are issued periodically is too
palpable to require comment or explanation. It is sufficient to
observe that, in our opinion, the fact that a publication is
issued at stated intervals, under a collective name, does not
necessarily make it a periodical. Were it not for the fact that
they are so issued in consecutive numbers, no one would
imagine for a moment that these publications were periodicals
and not books. While this fact may be entitled to weight in
determining the character of the publication, it is by no means
conclusive, when all their other characteristics are those of
books rather than those of magazines.

The fact that these publications are not bound when issued
or intended for preservation, is immaterial, since in France and
most of the Continental countries nearly all books, even of the
most serious and permanent character, are usually issued in
paper covers, thus leaving each purchaser to determine for
himself whether they are worth a binding of more substantial
character and preservation in his library. It is true that in
this subdivision of section 14 it is said that a periodical must
be without such substantial binding as to distinguish printed
books for preservation from periodical publications, but it is
by no means to be inferred from this that to constitute a book
the publication must have a substantial binding.

Great stress is laid by counsel upon the original interpreta-
tion of the term "periodical," as applied to these books, which
it is said was continued without change under different ad-
ministrations and by several successive Postmasters General,
and from 1879, the date of the passage of the act, until 1902,
when the certificates granted by the former Postmasters Gen-
eral were revoked by the defendant and a different classifica-
tion made of the publications now in issue, that the attention
of Congress was repeatedly called to the evils and to the large
expense incurred by the Government by the admission of
publications of this description to mail matter of the second
class; that Congress seriously considered these representations,

and committees made voluminous report thereon, yet Congress persistently refused to change by legislation the ruling of the Postmasters General in that regard.

We had occasion to consider this subject at length in the case of *United States* v. *Alabama R. R. Co.*, 142 U. S. 615, 621, in which we held that this court would look with disfavor upon a change whereby parties who have contracted with the Government on the faith of a former construction might be injured; especially when it is attempted to make the change retroactive, and to require from a contractor a return of moneys paid to him under the former construction. This case is not open to the same objections. No contract with the Government is set up whereby the latter agreed to carry these publications as second class mail matter. Much less is any repayment demanded of money paid by the Government under the prior construction. The action of the Government consists merely in the revocation of a certificate or license admitting these publications as mail matter of the second class. No vested right having been created by such certificate, no contract can be said to be impaired by its revocation. *Salt Co.* v. *East Saginaw*, 13 Wall. 373; *Grand Lodge* v. *New Orleans*, 166 U. S. 143, 147. It was said, in that case, that the construction is one which, though inconsistent with the literalism of the act, certainly consorted with the equities of the case. Whereas in the case under consideration, if we are to believe the statements of counsel, which are not denied, the carriage of these publications as second class mail matter entails annually an enormous loss upon the Government and constitutes an odious discrimination between publishers of books and publishers of the so-called periodicals.

But in addition to these considerations it is well settled that it is only where the language of the statute is ambiguous and susceptible of two reasonable interpretations that weight is given to the doctrine of contemporaneous construction. *United States* v. *Graham*, 110 U. S. 219; *United States* v. *Finnell*, 185 U. S. 236. Contemporaneous construction is a rule of inter-

pretation, but it is not an absolute one.   It does not preclude an inquiry by the courts as to the original correctness of such construction.   A custom of the department, however long continued by successive officers, must yield to the positive language of the statute.   As was said in the *Graham* case (p. 221), "if there were ambiguity or doubt, then such a practice, begun so early and continued so long, would be in the highest degree persuasive, if not absolutely controlling, in its effect.   But with the language clear and precise and with its meaning evident there is no room for construction and consequently no need of anything to give it aid.   The cases to this effect are numerous.   *Edwards' Lessee* v. *Darby*, 12 Wheat. 206; *United States* v. *Temple*, 105 U. S. 97; *Swift Co.* v. *United States*, 105 U. S. 691; *Ruggles* v. *Illinois*, 108 U. S. 526."   While it might well happen that by reason of the relative unimportance of the question when originally raised a too liberal construction might have been given to the word periodical, we cannot think that if this question had been raised for the first time after second class mail matter had obtained its present proportions, a like construction would have been given.   Some consideration in connection with the revocation of these certificates may properly be accorded to the great expense occasioned by this interpretation, and the discrimination in favor of certain publishers and against others, to which allusion has already been made.   We regard publications of the Riverside Literature Series as too clearly within the denomination of books to justify us in approving a classification of them as periodicals, notwithstanding the length of time such classification obtained, and we are therefore of opinion that the judgment of the Court of Appeals was correct, and it is

*Affirmed.*

Mr. Justice Harlan (with whom concurred the Chief Justice) dissenting.

The Chief Justice and myself are unable to concur in the opinion of the court.

It was admitted at the bar that for more than sixteen years prior to May 5, 1902, the Post Office Department had acted upon the identical construction of the statute for which the appellants contend.   During that period many different Postmasters General asked Congress to amend the statute so as to exclude from the mails, as second class matter, such publications as those issued by the appellant, and which, under the present ruling of the Department, are declared not to belong to that class of mailable matter.   Again and again Congress refused to so amend the statute, although earnestly urged by the Department to do so.

Representative Cannon, now Speaker of the House of Representatives, in a speech in opposition to the proposed change of the statute, explained the reasons that induced Congress to pass the act of March 3, 1879, c. 180, Rev. Stat. Supp. 454. He said: "Before speaking on the merits of this bill, I wish to say to the gentleman from Georgia that, according to my recollection, by legislation advisedly had, prior to 1879, while I was a member of the Committee on the Post Office and Post Roads, this class of literature was allowed to pass through the mails, the policy of that legislation being to encourage the dissemination of sound and desirable reading matter among the masses of the people of the country at cheap rates, both as to the cost of the books themselves and as to the postage.   The question was discussed, unless my memory greatly misleads me, and the legislation was advisedly had.   Under this legislation the best classes of literature, for instance, the Waverley Novels, Dickens's works, and the new translation of the Bible, have been sent by publishing houses unbound, stitched, so that they could be sold to the people at ten cents a volume.   As a consequence of this you may now find in the homes of our farmers and laboring men throughout the length and breadth of the country in this cheap form, issued at ten cents per volume, a class of literature to which, prior to the adoption of this policy, some people in very good circumstances could scarcely have access."   Cong. Rec. vol. 19, p. 911.

The result is that after the Department had for sixteen years construed the statute to mean what the appellants say it plainly means, and after Congress had uniformly refused, upon full investigation, to comply with the requests of Postmasters General to so amend the statute that it could be interpreted as the Government now insists it should always have been interpreted, the Post Office Department ruled, on May 5, 1902, that the appellants' publications, known as the "Riverside Literature Series," could not go through the mails as second class matter. This ruling was made notwithstanding a Post Office official, having power to act in the premises, had issued to the appellants a certificate declaring that the "Riverside Literature Series" had been determined by the Third Assistant Postmaster General to be a publication entitled to admission into the mails as second class matter.

Thus, by a mere order of the Department that has been accomplished which different Postmasters General had held could not be accomplished otherwise than by a change in the language of the statute itself, which change, as we have said, Congress deliberately refused to make after hearing all parties concerned and after extended debate in each House.

It has long been the established doctrine of this court that the practice of an Executive Department through a series of years should not be overthrown, unless such practice was obviously and clearly forbidden by the language of the statute under which it proceeded. In *United States* v. *Finnell*, 185 U. S. 236, 244, which case related to certain fees claimed by a clerk of a court of the United States, this court said: "It thus appears that the Government has for many years construed the statute of 1887 as meaning what we have said it may fairly be interpreted to mean, and has settled and closed the accounts of clerks upon the basis of such construction. If the construction thus acted upon by accounting officers for so many years should be overthrown, we apprehend that much confusion might arise. Of course, if the departmental construction of the statute in question were obviously or clearly wrong, it

would be the duty of the court to so adjudge. *United States v. Graham,* 110 U. S. 219; *Wisconsin C. R'd Co.* v. *United States,* 164 U. S. 190. But if there simply be doubt as to the soundness of that construction—and that is the utmost that can be asserted by the Government—the action during many years of the department charged with the execution of the statute should be respected, and not overruled except for cogent reasons. *Edwards* v. *Darby,* 12 Wheat. 206, 210; *United States* v. *Philbrick,* 120 U. S. 52, 59; *United States* v. *Johnson,* 124 U. S. 236, 253; *United States* v. *Alabama G. S. R'd Co.,* 142 U. S. 615, 621. Congress can enact such legislation as may be necessary to change the existing practice, if it deems that course conducive to the public interests."

In our judgment, the appellants properly construe the statute. We think it obviously means just what the Department held it to mean for more than sixteen years. But the very utmost that the Government can claim is that the statute in question is doubtful in its meaning and scope. The rule in such a case is not to disturb the long-continued practice of the Department in its execution of a statute, leaving to Congress to change it, when the public interests require that to be done. But the Department, after being informed repeatedly by Congress that the change asked by Postmasters General would not be made, concluded to effect the change by a mere order that would make the statute mean what the practice of sixteen years, and the repeated action of Congress, had practically said it did not mean and was never intended to mean. This is a mode of amending and making laws which ought not to be encouraged or approved.

It is suggested that the ruling of the Department was changed because of the increased expense attending the carrying, as second class mailable matter, of such publications as those of the appellants. But how could the fact of such expense justify a change in the settled construction of a statute? That was a matter to which the attention of Congress was specially and frequently called, and yet it refused to modify

the language of the statute. It was not the function of the Postmaster General to sit in judgment on the policy of legislation and to determine the extent to which Congress should authorize the expenditure of public moneys. The question of expense was entirely for the legislative branch of the Government.

Something has also been said as to the discretion committed to the Post Office Department in determining what is and what is not second class mailable matter. But what about the discretion with which previous Postmasters General had been invested, when for many years they uniformly held that such publications as the plaintiffs' were second class mailable matter? Is the discretion of one Postmaster General to be deemed of more importance than the discretion of five of his predecessors in office?

In our opinion the law is for the appellants, and it should have been so adjudged.