Stewart **UDALL**, Secretary of the Interior, Appellant,

v.

**STATES OF WISCONSIN, COLORADO AND MINNESOTA**, Appellees.

Stewart **UDALL**, Secretary of the Interior, Appellant,

v.

**STATE OF MICHIGAN**, Appellee. Nos. 16669, 16670.

United States Court of Appeals District of Columbia Circuit.

Argued April 25, 1962.

Decided June 28, 1962.

Petition for Rehearing En Banc Denied En Banc Sept. 17, 1962.

Miss Kathryn H. Baldwin, Attorney, Department of Justice, of the bar of the Supreme Court of Wisconsin, pro hac vice, by special leave of court, for appellant. Asst. Atty. Gen. William H. Orrick, Jr. and Messrs. Morton Hollander and Donald B. MacGuineas, Attorneys, Department of Justice, were on the brief for appellant. Mr. John G. Laughlin, Jr., Attorney, Department of Justice, also entered an appearance for appellant.

Mr. Roy G. Tulane, Madison, Wis., of the bar of the Supreme Court of Wisconsin, pro hac vice, by special leave of court, with whom Messrs. Newell A. Clapp, Washington, D. C., and Frank E. Hickey, Deputy Atty. Gen. of Colorado, were on the brief, for appellees in No. 16669.

Mr. Nicholas V. Olds, Asst. Atty. Gen. of Michigan, of the bar of the Supreme Court of Michigan, pro hac vice, by special leave of court, with whom Messrs. Wendell Lund and Joseph B. Levin, Washington, D. C., were on the brief, for appellee in No. 16670.

Before WILBUR K. MILLER, Chief Judge, and WASHINGTON and WRIGHT, Circuit Judges.

WRIGHT, Circuit Judge.

These cases arise out of a dispute over the proper method of allocating funds to the several states under the Pittman-Robertson Act.[1] Also known as the Federal Aid to Wildlife Restoration Act, that statute provides for distribution among the states, for use in approved wildlife conservation projects, of receipts from the federal excise tax on firearms, shells and cartridges. Since 1939,[2] the Secretary of the Interior has been charged with the administration of the Act. He is required, initially, to apportion the net receipts[3] among the several states, one-half on an area basis, the remaining portion "in the ratio which the number of paid hunting-license holders of each State in the preceding fiscal year, as certified to [him] by the State fish and game departments, bears to the total number of paid hunting-license holders of all the States." 16 U.S.C.A. § 669c. Upon notice of the amount set aside for its use, each participating state must submit details of its wildlife project, and,

if the Secretary approves it, the allocated moneys are ultimately paid to the applicant state on a matching basis.[4] 16 U.S.C.A. §§ 669d–669f.

We are here concerned only with the initial apportionment. The sole issue on the merits is whether the tentative allocation of the second half of the "Federal aid to wildlife-restoration fund," into which the tax moneys are deposited, should be made on the basis of the number of hunting *licenses* sold by a particular state, irrespective of the fact that two or more licenses may have been sold to the same person, or, rather, on the basis of the number of different *individuals* holding licenses from the state, irrespective of the fact that some of them may hold more than one license. The Secretary takes the latter view. Accordingly, when the appellee states, Wisconsin, Colorado, Minnesota and Michigan, declined to certify the number of persons holding licenses, he refused them the full allocation.[5] The states, maintaining that apportionment should be made on the basis of total licenses issued, brought mandamus[6] to compel the Secretary to credit their respective accounts on this basis.[7] The Secretary challenged

1. Act of September 2, 1937, 50 Stat. 917, 16 U.S.C.A. § 669 et seq.

2. Originally the Secretary of Agriculture administered the Act. But the function was transferred to the Secretary of the Interior by 1939 Reorganization Plan No. II, § 4(f). 53 Stat. 1431, 1433–1434, 5 U.S.C.A. § 133t note.

3. After deduction of expenses incurred by his Department in administering the Act.

4. The state must itself defray a minimum of 25 per cent of the cost of the project. 16 U.S.C.A. § 669e.

5. He credited their respective accounts with a sum equivalent to their share of the fund based on clearly non-duplicating licenses and held a substantial balance in reserve in the event they should ultimately comply.

6. Wisconsin, Colorado and Minnesota joined in a single complaint, while Michigan brought a separate action. But the two suits, involving the identical question, were consolidated below. We likewise consider them together.

7. The prayer to each of the complaints, in addition to asking for a declaratory judgment that "license holders" means total licenses issued, and for an order directing the Secretary to make his initial apportionment on that basis, further requests that he be ordered "to prepare and file with the appropriate agencies of the government of the United States the appropriate certificates and papers to cause the payment of the said funds to the plaintiff states." Insofar as this last prayer asks that the Secretary make final certification which leads to payment by the Treasury, it is clearly premature, since, under the scheme of the Act, "no payment of any money apportioned * * * shall be made on any project until such [full and detailed] statement of the [wildlife-restoration] project and the plans, specifications, and estimates thereof shall have been submitted to and approved by the Secretary of the Interior," all of which occurs after the initial apportionment. 16 U.S.C.A. § 669e. See also, id., § 669f, which indicates that actual payment normally fol-

the jurisdiction of the District Court to entertain the action, but also answered on the merits. There being no dispute as to the material facts, both sides filed motions for summary judgment, supported by numerous documents and affidavits. The court below denied the Secretary's several motions and awarded summary judgment to the plaintiff states, declaring their interpretation of the Act correct and ordering the Secretary to act accordingly.

I

■ At the threshold of the case, we are met by a jurisdictional problem. The Secretary insists that this is, in effect, an unconsented suit against the United States, and adds that, in any event, mandamus will not lie under the circumstances. He thus seeks to insulate himself behind two distinct lines of defense. The first is the doctrine of sovereign immunity from suit, which is said to be

applicable to this proceeding because it involves the "disposition of sovereign property." [8] The second is the rule that courts will not "intrude" to compel discretionary action, invoked on the ground that the Secretary's duty to act "turns on matters of doubtful or highly debatable inference from large or loose statutory terms." [9] But, as Judge Miller and I view the matter,[10] both obstacles are overcome by the finding that, as to the matters in suit, the Secretary of the Interior had no discretion.

In this we follow Clackamas County, Ore. v. McKay, 94 U.S.App.D.C. 108, 219 F.2d 479.[11] We put to one side all the talk about the boundary between "private" and "official" deeds,[12] the more subtle difference between merely "tortious" acts and "ultra vires" acts (or acts committed pursuant to "unconstitutional authority"),[13] and the baffling distinction between "affirmative" action and "nega-

lows *completion* of the project. More likely, however, the demand is only for certification by the Secretary of the Interior to the Secretary of the Treasury of the initial apportionment, required under 16 U.S.C.A. § 669d. The District Judge apparently so viewed it, and, in this court, at least, appellees say that is all they want.

8  Citing principally Mine Safety Appliances Co. v. Forrestal, 326 U.S. 371, 66 S.Ct. 219, 90 L.Ed. 140, and Larson v. Domestic & Foreign Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628. Appellees respond, inter alia, that the funds involved, having been dedicated to the states by Congress, are no longer the property of the sovereign, and that the Secretary, as a mere temporary custodian of the moneys, has no proprietary interest therein. Moreover, they point out that this is not a suit for a money judgment, but merely for a tentative apportionment. See Note 7, supra. We do not rely on these arguments.

9. Citing Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 318–319, 78 S.Ct. 752, 2 L.Ed.2d 788.

10. Judge Washington does not concur in Part I of this opinion. But, because a majority of the panel holds that the district court had jurisdiction to entertain the suit, he reaches the merits and concurs in Part II of this opinion and in the

judgment. Judge Miller, while concurring in Part I, dissents on the merits.

11. Judgment vacated as moot, 349 U.S. 909, 75 S.Ct. 599, 99 L.Ed. 1244.

12. See, e. g., Governor of Georgia v. Madrazo, 26 U.S. (1 Pet.) 110, 123, 7 L.Ed. 73; Ex parte Young, 209 U.S. 123, 151, 28 S.Ct. 441, 52 L.Ed. 714.

13. In Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168, the Supreme Court reiterated the rule of Larson v. Domestic & Foreign Corp., supra, that a suit for specific relief can be maintained against an officer of the sovereign only if his action is "so illegal" as not to be "within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void." 369 U.S., at 647, 82 S.Ct. at 983, quoting 337 U.S., at 702, 69 S.Ct. at 1467. But this principle has no application in mandamus actions to compel "executive Government officials to comply with directives of the Congress where a specific directive impose[s] a ministerial duty devoid of the exercise of judgment or discretion." Clackamas County, Ore. v. McKay, supra, 94 U.S.App. D.C. at 118, 219 F.2d at 489, and cases there cited in Note 29. Marbury v. Madison, 5 U.S. (1 Cranch) 137, has not been discarded; it still controls suits of this character.

tive" action.[14] Without rehearsing all the theories under which such cases have been decided, we simply inquire whether, in the premises, the Secretary of the Interior exercises discretion delegated to him, or merely performs a ministerial function. For the reasons elaborated by Judge Prettyman in Clackamas, if the act is ministerial it does not "involve sovereign power" and the Secretary enjoys no immunity from suit with respect to it. Id., at 94 U.S.App.D.C. 122–123, 219 F.2d 479. And, in such a case, of course, mandamus may issue to compel performance. Marbury v. Madison, supra.

Here, clearly, the Secretary of the Interior was given no discretion in the initial apportionment of the wildlife-restoration fund.[15] He was expressly told to allocate half of it on an acreage basis among the participating states and the other half in proportion to the number of hunting-license holders from each state. And, even in determining that number, he was not authorized to make his own computation, but was directed to accept the state certificates. No judgment, no discretion, is involved. The Secretary's function, in this respect, is almost a purely mechanical one.

It is said, however, that vague legislative language creates an area of doubt requiring the exercise of administrative discretion. But, whatever the merits of that doctrine in different circumstances,[16] it does not apply to this case. There are here no "large or loose statutory terms." Panama Canal Co. v. Grace Line, Inc., supra, at 318, 78 S.Ct. at 757. The only term in dispute is "hunting-license holders," and, though some effort is made to read two meanings into that apparently clear expression, no one pretends that Congress thought it ambiguous or intended the Secretary to construe it as he saw fit. Obviously, Congress meant only one thing by the term. In view of the controversy over its true construction, the court must decide what was intended. But that implies no discretion in the administrator of the Act. Nor does it matter, for jurisdictional purposes, if it can be shown that the question was "much mooted" within the Secretary's office, or that, in applying the statute, he formerly gave the phrase a different construction from that here found correct. For, executive officers "cannot by bootstraps manufactured by them lift themselves out of the jurisdiction of the courts," Clackamas County, Ore. v. McKay, supra, at 94 U.S. App.D.C. 124, 219 F.2d 479, and a misapplication of the statute which results from a "mistake of law," rather than the exercise of delegated discretion, does not bar judicial relief. See Panama Canal Co. v. Grace Line, Inc., supra, at 318, 78 S.Ct. at 757. We conclude that the District Court had jurisdiction to entertain the action and, if appropriate, grant mandamus against the Secretary of the Interior.

## II

On the merits, however, we cannot sustain the judgment below. Judge Washington and I think[17] the term "hunting-license holders" refers to persons, not permits. Otherwise, the word "holders" is entirely superfluous.[18] It

---

14. See, e. g., Larson v. Domestic & Foreign Corp., supra, at 691, 69 S.Ct. at 1462, Note 11. But see Clackamas County, Ore. v. McKay, supra, at 120 ff., 219 F.2d 479, for a statement of the irrelevance of that distinction in proceedings of this type.

15. This is not to say that the Secretary exercises no discretion at later stages of the administrative process. It may well be, for instance, that approval or disapproval of a conservation project submitted by a state, 16 U.S.C.A. § 669e, involves an administrative judgment which is not judicially reviewable by mandamus.

16. For a rejection of the doctrine that statutory construction is an exercise of administrative judgment or discretion, see the admonition of Mr. Justice Peckham, writing for the Court, in Roberts v. United States, 176 U.S. 221, 231, 20 S.Ct. 376, 44 L.Ed. 443, quoted with approval in Lane v. Hoglund, 244 U.S. 174, 182, 37 S. Ct. 558, 61 L.Ed. 1066.

17. See Note 10, supra. Judge Miller does not concur in this portion of the opinion.

18. Within a month after issuance of a formal opinion so holding by the Solicitor of the Department of the Interior on

is the number of *different individuals* holding licenses that must be counted, rather than the total number of licenses issued. Language cannot be clearer. Yet we are told that what seems plain is not plain, and that we should follow the current fashion of analysing legislative history and administrative interpretation, ignoring the clear language of the statutory text. But even this gambit fails.

Indeed, the legislative history, such as it is, proves nothing. There are, it is true, a few references to computation on the basis of "licenses," [19] but that only betrays the common assumption that the number of licenses and the number of individual license holders were the same.[20] In the absence of evidence of a conscious

contrast between licenses and licensees, we cannot read significance into the few shreds tendered us. Nor is the evidence supporting Congressional adoption of a different administrative interpretation convincing. For, again, an apparently uninformed Committee was merely presented with a description of the apportionment formula in terms of "licenses" with no suggestion of the possible difference between that measure and the one set forth in the statute. Certainly, the repeated use of the word "licenses" in the appearances of the Secretary's representatives before Congressional committees cannot be read as more than bureaucratic shorthand for the more cumbersome statutory term "paid hunting-license holders." [21]

June 4, 1959, see note 22, infra, no less than nine bills were introduced in Congress seeking to change the apportionment formula by deleting the crucial word "holders." None became legislation. See H.R. 7741, 86th Cong., 1st Sess., 105 Cong.Rec. 10881; H.R. 7788, id. 11150; H.R. 7824–7828, id. 11336; H.R. 7854, id. 11337; H.R. 7912, id. 11679; S. 1021, id. 2220, 2223, 6449. See also, H.R. 4702, 87th Cong., 1st Sess., 107 Cong.Rec. 2499.

19. For instance, Representative Robertson, one of the sponsors of the bill, broadly described the operation of the proposed enactment as follows:
   " * * * the bill provides that there is authorized to be appropriated an amount equal to the excise tax of 10 percent on sporting guns and ammunition, to be allocated as grants-in-aid on the basis of one-half on area and one-half of the amount of hunting licenses that are sold in the several States of the Union. * * *" 81 Cong.Rec., 75th Cong., 1st Sess., p. 9351.
   And Senator Pittman made a similar reference to, "hunting and fishing licenses" as one of the bases for apportionment of the fund. Id., p. 8506. But these are not careful utterances, meaningfully distinguishing between licenses and licensees. Nor can anything significant be read into the Committee Report on the bill which, after summarizing the apportionment scheme in the same terms as the statute, "paid hunting-license holders," gives an illustrative computation based apparently on total licenses issued, presumably because those were the only figures then available. See

House Report No. 1572, 75th Cong., 1st Sess., p. 3.

20. This was generally true in 1937 when the statute was enacted. The multiplication of limited hunting licenses is largely a recent phenomenon. Nevertheless, as the plaintiff states were at pains to show, there was some possible duplication of licenses in the same holder from the beginning, and while the floor speakers for the bill in Congress may not have known it, or did not think it worth mentioning, it is clear the Fish and Wildlife Service officials, who were probably the true draftsmen of the Act, realized the problem from the first. Thus, the very first Manual issued in 1938 as a guide to the administration of the Act qualifies the broad rule that the state certificate should include "all licenses defined as hunting licenses by State laws" with the caveat that "[s]pecial licenses issued only after a general license has been purchased should not be counted, as the law requires the number of license holders and not the number of individual licenses." It is therefore reasonable to conclude that, though many Congressmen who voted for the bill probably did not then appreciate the difference, the word "holder" was purposefully added in the apportionment formula.

21. Primary reliance is placed on the testimony of Department officials who, until 1950, appeared briefly once a year before a Congressional committee in connection with appropriations to the wildlife fund. Typical of these appearances is the following colloquy in 1941, here reproduced in full insofar as it bears on

As to the administrative practice, it does appear that, for some twenty years, the administrators of the Act apportioned the fund on the basis of the total number of licenses issued by each state, eliminating only multiple licenses obviously issued to the same person. But it is plain they always knew that the law required the elimination of *all* duplications,[22] and indulged in the erroneous computations because only total license figures were furnished them. The Secretary of the Interior may be charged with having been remiss in not correcting the error

the method of apportioning the fund:
"Senator GURNEY. Mr. Gabrielson [Director of Interior's Fish and Wildlife Service]. how is this money fairly apportioned among the States?

"Mr. GABRIELSON. The law itself directs the method of apportioning it. One half of it is apportioned upon the basis of area of the State to the total area of the United States, and the other half on the percentage of license sales in the State to the total sold. So that you get some sort of a balance between area of a State and population.

"Senator GURNEY. That seems to be fair.

"Mr. GABRIELSON. I think it is fairly satisfactory; at least, none of the States complain about it."

Hearings on H.R. 4590 (Interior Department Appropriation Bill for 1942), 77th Cong., 1st Sess., p. 241.

22. As already noted, Note 20 supra, the 1938 Manual expressly recognized that "the law requires the number of paid license holders and not the number of individual licenses." That language was retained in the succeeding editions of the Manual through at least 1958, and was repeated in the Regulatory Announcements of the Fish and Wildlife Service issued between 1941 and 1957. In 1959 the Solicitor of the Department of the Interior issued a formal opinion emphatically holding that "in apportioning Federal funds for wildlife restoration purposes under section 4 of the act the Secretary of the Interior should include as 'license holders of each State' all individuals to whom a State has issued one or more licenses; he should not include all licenses issued by a State when, under State law, more than one license may be issued to a single individual." Solicitor's Opinion M–36560, June 4, 1959, 66 I.D. 219, 224.

sooner. Yet, in the absence of Congressional approval, his disinterested [23] acquiescence in an erroneous practice cannot change the clear letter of the law.[24]

We hold that the Act means what it says and that the Secretary of the Interior, albeit late, has correctly applied it.[25] Accordingly, the order below must be vacated and the cases remanded to the District Court with directions to grant appellant's motions for summary judgment and dismiss the suits on the merits.[26]

So ordered.

23. The Secretary is, in a sense, only the man in between. In principle, the whole fund is distributed among the several states, the Secretary deducting only administrative expenses. The real argument, then, is between those states with fragmented licensing systems and those with relatively simple license structures.

24. There is, of course, nothing inherently more reasonable about apportioning on the basis of total licenses rather than license holders. On the contrary, appellees' interpretation would encourage a system of particularized licenses for each type of game in what the Secretary rightly labels "an unseemly grab for federal funds," which Congress cannot be assumed to have intended.

25. "A custom of the department, however long continued by successive officers, must yield to the positive language of the statute." Houghton v. Payne, 194 U.S. 88, 100, 24 S.Ct. 590, 48 L.Ed. 888.

26. The argument of the dissent that "there was no proof that there were more licenses than licensees in the four appellate States during the period involved" contradicts the underlying assumption of these cases. Indeed, the whole controversy is predicated on the fact that there is a substantial difference, at least in the plaintiff States, between the total number of licenses and the number of individual license holders. Appellees clearly acknowledged as much when they protested the form of the certificate required by the Secretary of the Interior and his refusal to accept total license figures in lieu thereof. And their prosecution of these proceedings, specifically aimed at obtaining a declaration that "paid hunting license holders" means total licenses issued, shows the importance of the issue to them.

WASHINGTON, Circuit Judge, concurring in the result):

To me, this is not a case for mandamus. In my view, the Secretary's task is not merely ministerial; moneys of the United States are involved; and the statute is ambiguous. There is also presented a question of federal-state relations more suitable, I think, for congressional than for judicial settlement. In these circumstances, I think that under the Supreme Court's decision in Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 78 S.Ct. 752 (1958), we should order that the complaint be dismissed for lack of jurisdiction.

However, since the other members of this panel consider that we do possess jurisdiction, and reach the merits, I will likewise reach the merits, so that the case may be disposed of. Cf. Screws v. United States, 325 U.S. 91, 134, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (opinion of Rutledge, J.). I think the Secretary's present construction of the statute is a proper one, and will join Judge Wright in voting to reverse the judgment of the District Court, for the reasons given in Part II of his opinion.

WILBUR K. MILLER, Chief Judge (concurring in part and dissenting in part). Judge Wright is correct, I think, in rejecting the Secretary's contention that this is an unconsented suit against the United States. And I agree with his holding that

" * * * even in determining that number [of paid license holders in the several states], he [the Secretary] was not authorized to make his own computation, but was directed to accept the state certificates. No judgment, no discretion, is involved. The Secretary's function, in this respect, is almost a purely mechanical one."

Accordingly, I concur in his conclusion that the District Court had jurisdiction to issue an order in the nature of mandamus requiring the Secretary of the Interior to allocate the wildlife restoration fund in accordance with the court's construction of the Act.

I dissent, however, from the action of the majority in vacating the order appealed from and in remanding to the District Court with directions to grant the Secretary's motion for summary judgment and dismiss the suit on the merits. As the reason for their action, my colleagues rely on the statutory term "number of paid hunting-license holders," which they say is unambiguous and plainly refers to number of individuals and not to number of licenses issued. Thus they rest their decision upon the statutory language alone, unaided by any extraneous explanatory matter and uninfluenced by the change in state licensing structures which they say has occurred since the Act was adopted.

To be sure, it is ordinarily true that unambiguous statutory language which has rational significance should be given its literal meaning without resort to legislative history; that when the legislative intent is clearly expressed in the statute, there is no need for extrinsic evidence of that intent. Whether that principle may properly be applied here is doubtful, to say the least. The majority opinion notes that in 1937, when the statute was enacted, it was generally true that "the number of licenses and the number of individual license holders were the same." [1] That being so, there was at the time of enactment no occasion for Congress to disinguish between number of licenses and number of license holders, and its use of one of the terms cannot be said to have been the result of a deliberate choice of that term to the exclusion of the other. For that reason, I do not believe the statutory language, standing alone, shows Congress consciously and intentionally intended to prescribe the one and not the other as the basis for apportionment. Surely the development of multiple licensing after the statute's enactment cannot justify attributing to Congress an intention in

1. "The multiplication of limited hunting licenses," say the majority, "is largely a recent phenomenen."

1937 to deal with a situation which did not then exist.

Accordingly, I think it not only proper but necessary to examine the legislative history to ascertain the Congressional intent at the time of enactment, and also to consider whether administrative interpretation of the statute and subsequent legislative action with respect to it indicate what the intent was. The majority dismiss these considerations by saying the legislative history proves nothing, and that evidence of Congressional adoption of a different administrative interpretation is not convincing.

I think the legislative history establishes beyond peradventure that Congress thought of "the number of paid hunting-license holders" as being the same thing as the number of licenses issued and, therefore, did not intend to prescribe the one and not the other as a basis for apportionment. In the circumstances at the time of enactment, there was a holder for each license and so the statutory use of the former word instead of the latter was entirely fortuitous; the word "license" was used during the committee hearings and on the floors of the House and Senate in describing that portion of the statutory scheme of apportionment.

A few words as to the legislative history will illustrate this. The Act was introduced in the Congress as S. 2670 and H.R. 7681, 75th Congress, 1st Session, both bills having been prepared by the Conservation Committees of the House and Senate in collaboration with certain national wildlife associations and agencies. During the hearings, Carl D. Shoemaker, Secretary of the Senate Special Committee on Conservation of Wildlife Resources and Secretary of the General Wildlife Federation, made the following explanatory statement: [2]

"The manner in which the States will be allocated this money is based upon the area of the State and *the total number of hunting licenses issued in the States*. One-half of the fund will be allocated on the ratio that the area of the State bears to the total area of the United States. This will take care of the larger area States with small populations, and the other half will be allocated on the ratio *that the total number of hunting licenses issued in the State bears to the total number issued in all the States*." (Emphasis added.)

In explaining the legislation on the floor of the Senate, Senator Pittman, who had sponsored the bill, said: [3] "Area and *hunting and fishing licenses* are the bases for apportionment." (Emphasis supplied.) The House of Representatives was informed by Representative Robertson, sponsor of the companion House bill, that the number of hunting licenses sold was to be the basis of the apportionment. He stated: [4]

"* * * [T]he bill provides that there is authorized to be appropriated an amount equal to the excise tax of 10 percent on sporting guns and ammunition, to be allocated as grants-in-aid on the basis of one-half on area *and one-half on the amount of hunting licenses that are sold in the several States of the Union*. * * *" (Emphasis supplied.)

In addition to the legislative history, the administrative interpretation is significant. For more than twenty years after the passage of the statute in 1937, the Departments successively in charge of apportioning payments thereunder computed them on the basis of the number of licenses issued, rather than the number of persons to whom licenses had been issued. This was not disputed by the Secretary, and was admitted by his attorney in the District Court in a colloquy with the trial judge.[5] The prac-

---

2. Hearing Before the House Special Committee on Conservation of Wildlife Resources, 75th Cong., 1st Sess., p. 40 (1937).

3. 81 Cong.Rec. 8506 (1937).

4. 81 Cong.Rec. 9351 (1937).

5. "THE COURT: At that time, the licenses were broken down and itemized and that

tice was authorized by official manuals issued by the supervising Departments: in 1938, the manual of instructions said, " * * * [E]ach State's share must be based in part on the number of licenses sold during the fiscal year" and that "In certifying the number of paid hunting licenses to the Department, there should be included all licenses defined as hunting licenses by State laws." Successive revisions of the manual of instructions, including that of 1957, contained in substance the same provision.

The administrative interpretation of the statute was not disturbed by subsequent implementing legislation. From 1937 until 1950, Congress made annual appropriations for the Federal Aid to Wildlife Restoration Fund.[6] In none of these years did Congress express dissatisfaction with the administrative use of the number of licenses as the basis for apportionment, although it knew the number of licenses issued was the basis used by the Department. The proposition that long-continued acquiescence by Congress gives administrative interpretation the authority of law is so well understood it is unnecessary to cite authority to support it.

In addition, there was no proof that there were more licenses than licensees in the four appellee States during the period involved. The Secretary merely assumed that the number of licenses exceeded the number of individual holders; he admitted as much when he said: [7]

" * * * Statistics as to the number of hunters who purchased more than one license were not maintained by the Plaintiff States. These certifications did not, however, show af-

firmatively that they contained duplications of individual license holders. *It might be that no individual in the state had purchased both a big game and a small game license.*" (Emphasis added.)

Thus, on the basis of an assumption which he admitted had no evidentiary foundation and might not be correct, the Secretary refused to apportion the funds according to the four States' certifications. So, the last sentence in the foregoing quotation, which I have italicized, seems to me to be a concession by the Secretary that he acted arbitrarily in concluding the number of issued licenses exceeded the number of holders.

The statute says the Secretary "shall apportion" one half of the revenues in the fund among the several states "in the ratio which the number of paid hunting-license holders of each State * * * *as certified to said Secretary by the State fish and game departments,* bears to the total number of paid hunting-license holders of all the States." (Emphasis supplied.) It was affirmatively stated by the Secretary in his proposed findings of fact that "Wisconsin, Minnesota, Colorado, and Michigan * * * submitted certifications of the number of 'paid hunting license holders.'" It is, therefore, apparent that the Secretary did not obey the plain direction of the statute that he act on the certificates of the states; he refused to apportion on those certifications, although it was his duty to do so, as the majority state. Instead he attempted to justify his disobedience by saying:

" * * * These [certificates] showed on their face * * * that

those licenses were the number of licenses issued.

"MR. MACGUINEAS: That is right. .

"THE COURT: Not number of persons?

"MR. MACGUINEAS: That is right.

"THE COURT: Now that policy then was followed by the Department of Interior from the time of the passage of the Act up until, what 1959?

"MR. MACGUINEAS: Well until this new opinion [of the Department's Solicitor] came out, that was 1959."

6. The statute of 1950 (64 Stat. 693) made annual appropriations unnecessary thereafter.

7. I quote this from numbered paragraph 6 of the proposed amended findings of fact submitted by the Secretary to the District Court. The last two sentences are repeated in his brief.

the number of 'license holders' certified was actually the total number of hunting licenses sold, rather than the number of individuals to whom one or more licenses had been sold * * *."

Yet he admitted, as I have said, that he only surmised there were more licenses than holders. This was a plain attempt by the Secretary to exercise discretion in an area in which the majority hold—and I agree—he has "No judgment, no discretion."

One final comment. The Secretary's suggestion that, under the District Court's ruling, the states might multiply their hunting licenses in order to obtain a larger portion of federal funds imputes venality to them without any real reason for doing so. I am unwilling to believe, without convincing proof, that the legislatures of sovereign states would enlarge the number of their hunting licenses from such an unworthy motive.

I think the trial judge was clearly right, and I would affirm his judgment.